Horace FISHBACK, Jr., and Margaret N. Fishback, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 1314.

United States District Court
D. South Dakota, S. D.

April 16, 1963.

Lyle E. Cheever, of Cheever & Mydland, Brookings, S. D., for plaintiffs.

Joyle C. Dahl, Department of Justice, Washington, D. C., and Harold C. Doyle, U. S. Dist. Atty., for the District of South Dakota, Sioux Falls, S. D., for defendant.

MICKELSON, Chief Judge.

Plaintiffs in this action, Horace Fishback, Jr., and Margaret N. Fishback, husband and wife, bring this action to recover the additional income taxes assessed and paid by them in the amount of $3,489.56, plus interest, as a result of the disallowing of capital gains treatment on income received from the sale of certain property in the years 1956, 1957 and 1958. Plaintiff Margaret N. Fishback is a necessary party only because she signed joint tax returns for the years in question. Hereinafter, reference will be made only to Mr. Fishback, as "taxpayer", unless otherwise noted.

Taxpayer is a long time resident of Brookings, South Dakota. He has been engaged in the banking business in Brookings since 1925, and is presently president of the First National Bank in that city.

Taxpayer's father, Horace Fishback, Sr., acquired the land in question, a 20 acre tract on the north edge of Brookings, in 1898. Upon his death in 1929, the land became a part of his estate and descended to members of his family. In 1946, taxpayer acquired title to the tract when an adjustment of family property interests was made. There was no cash transaction and taxpayer took the land at the inventory price of $4,000. Prior to 1946, the land had been used for pasturing livestock and was commonly referred to in the community as "Fishback's pasture." Taxpayer testified that he intended to continue to use the property for pasture purposes at the time he acquired it in 1946, and the evidence shows that he did so use it subsequent to that time. The land was unplatted and unimproved. In 1950 or 1951, a sewer line and curb and gutter were installed on Sixth Avenue, the street which bounds the property on the east. Taxpayer's share of the cost was $1,497.23.

Taxpayer was approached in 1950 and 1951 about selling lots in the tract. He testified, however, that he was not interested in doing so. Taxpayer was not engaged in the real estate business as such. He managed some local property for out of state owners. He derived commissions from occasional sales of land in his work at the bank, but at no time did he hold himself out as a real estate broker.

Taxpayer testified that the city of Brookings really did not begin to grow until 1950. After 1950, several new housing additions were developed. In 1954, a 20 acre tract was developed by private interests, and in that same year some housing was built in a new addition on the east edge of Brookings.

In the fall of 1954, Mr. Vincent F. Hart spoke to taxpayer about subdividing the Fishback 20 acre tract. Mr. Hart had operated an implement dealership in Brookings from 1946 until 1954, when he opened a real estate office in the

city. Hart testified that a good deal of subdividing was being done in Brookings in 1954, and that he was interested in developing some subdivision property. He stated that he went to see taxpayer about the property in 1954, and that taxpayer then said that he didn't want a thing to do with subdividing the property. Mr. Hart visited with taxpayer about the land several times after this date. In February of 1955, he made a proposition to taxpayer concerning the land. As a result of these discussions, taxpayer and Mr. Hart entered into an oral contract concerning the development and subdividing of the property. On April 19, 1955, a written contract was signed by taxpayer and his wife and Mr. Hart. By the terms of the contract, the legal title to the lots was to be vested in taxpayer and his wife as joint tenants as soon as the plat of the lots was approved and filed. The contract stated that taxpayer was desirous of working out plans and arrangements with Mr. Hart for the "development" of the property. Mr. Hart agreed to deposit $14,000 to the credit of the Fishback Subdivision account. He also agreed to proceed with the development of the tract "on plans and a plat" that would be mutually acceptable to both parties to the agreement. He was to see that the lots were surveyed and staked out, that proper grades were established, that necessary streets, sewers, and curbs and gutters were constructed, that paving was done, and that all other work was performed that might be necessary for the development of the subdivision. Mr. Hart was to pay for the development work out of the $14,000 he was to deposit in the account and out of money collected in the future from the sale of lots. The money from the sale of lots was to be deposited in the Fishback Subdivision account. Taxpayer was to receive $400 from the sale of each lot at the time such sale was closed. It was agreed that an accounting should be made at least once a year and oftener if mutually agreed upon. A substantial balance was to be kept in the Fishback Subdivision account for the purpose of paying any additional expenses that might arise in connection with the development. The first payment from any surplus funds that should accrue in the account was to be made to the taxpayer to reimburse him for the $1,497.23 he had previously spent for the construction of the sewer and curb and gutter on Sixth Avenue. The next payments from surplus were to be made to Mr. Hart in repayment of the $14,000 which he was to advance. All future surplus funds were to be divided equally between the parties. The agreement was to terminate when all the lots had been sold, or not later than April 1, 1965. In the event of Hart's death or disability, or if he left the city, the agreement was to terminate, with the provision that it was to remain in effect until the $14,000 had been paid to Hart or his estate. Finally, the contract stated that the parties agreed and understood that the agreement was not a partnership but an agreement for the management and sale of lots.

In accordance with the terms of the agreement, Mr. Hart had an engineer survey and lay out the lots. He drew up a plat and filed it with the city after the taxpayer and his wife had approved it. Hart entered into contracts for the grading of the streets and construction of the sewer and water lines. He fixed the sale price of the lots, took care of the advertising kept the books, wrote checks, and paid the bills. He deposited the money received from the sale of lots in a "Hart-Fishback Subdivision Account." None of the money received was recorded in the books of Hart's real estate business, nor were any of the development expenses so recorded. When a lot was sold, Hart prepared the necessary title documents.

Taxpayer sold no lots himself. He directed all inquiries to Hart. He testified that he observed the grading of the streets and the installation of the sewer lines and curb and gutter and found the work satisfactory. He went over the plat and approved it before it was filed. According to the testimony, three different plats were prepared before one was

agreed upon by the parties. Taxpayer had an occasional conference with Hart concerning policy matters. Taxpayer and his wife signed the necessary title papers whenever a lot was sold.

Taxpayer contends that he is entitled to capital gains treatment on the $400 he received for each lot sold. For these proceeds to be considered as capital gain, they must have been realized from the sale of a capital asset. For the purposes of this case, a capital asset is defined as all property except property held primarily for sale to customers in the ordinary course of trade or business. I.R.C.1954, sec. 1221; 26 U.S.C.A. § 1221.

There has been much litigation on the question whether property owners who subdivide unimproved property are entitled to capital gains treatment of the proceeds from the sale of such property. No attempt will be made to discuss all of the cases because the Court is of the opinion that many of them are inapposite to the present case.

Certain basic principles can be derived from the cases. A property owner is entitled to liquidate a capital asset by a sale conducted in the most advantageous manner, so long as he does not enter the real estate business. Dillon v. Commissioner, 8 Cir., 1954, 213 F. 2d 218; Home Co., Inc. v. Commissioner, 10 Cir., 1954, 212 F.2d 637. In other words, if the owner's activities are such that he is deemed to hold the property for sale to customers in the ordinary course of business, he is not entitled to capital gains treatment. Whether property is held for sale to customers in the ordinary course of business is a question of fact. Friend v. Commissioner, 10 Cir., 1952, 198 F.2d 285. While of course each case must be decided upon its own facts, certain evidentiary tests have been evolved from the cases. Some of these factors or tests are: (1) the purpose for which the property was acquired; (2) the purpose for which it was held; (3) the extent of any improvements made to the property by the taxpayer; (4) the frequency, number and continuity of sales; (5) the extent and substantiality of the transactions; (6) the nature and extent of taxpayer's business; (7) the extent of any promotional advertising, or the lack thereof; and (8) whether the property was listed for sale directly or through brokers. Kaltreider v. Commissioner, 3 Cir., 1958, 255 F.2d 833; Smith v. Dunn, 5 Cir., 1955, 224 F.2d 353.

Of the cases relied upon by the taxpayer, the two which are most nearly similar to the instant case are Smith v. Dunn, supra, and Yunker v. Commissioner, 6 Cir., 1958, 256 F.2d 130.

In the Smith case, taxpayer, who was a practicing architect, and his brother inherited some land from their father. They decided to subdivide and liquidate the property. They employed an engineer to survey and plat the land. They then turned the property over to a real estate broker to be sold according to the broker's plans on a ten per cent commission basis. The broker advertised the property, fixed the prices on the lots, paid all expenses, and remitted the net balance of the proceeds to the owners. Taxpayer's sole activity with relation to the sale of the lots was the signing of the deeds prepared by the broker. The court considered the broker's activities to be that of an independent contractor and held that the taxpayer was entitled to capital gains treatment.

In the Yunker case, the taxpayers wished to liquidate some 75 acres of undeveloped farm land which they had inherited. They wanted to sell the property as one tract but discovered that they were unable to do so. The real estate agent whom they contacted advised them that the property would have to be subdivided. It was he who put up the money to have the property surveyed and subdivided. He arranged for a road to be constructed to the property and had water and utility lines brought in. All this was done with the understanding that he would receive his advances from the proceeds of the first sales. He was also employed to handle the sales of the various parcels on a commission basis as the agent of the taxpayers. The court held that the taxpayers were entitled to take

steps to make the property more valuable and attractive to customers. So long as these activities were primarily liquidating in nature, they did not divest the property of its character as a capital asset. The court concluded that one who finds that he can advantageously dispose of inherited land only by having it sold in smaller parcels through a real estate dealer is not to be denied the right to capital gains treatment by a forced construction of the statute.

 This Court generally concurs in the views expressed by the courts in these two decisions. The Court finds, however, that it must agree with the government's contention that the cases are not controlling in the present instance because of factual differences. The government's theory of the case is that so long as the property in question was held solely by taxpayer, it had the character of a capital asset, but that when the contract was entered into for the "development" of the area, as contrasted to the "liquidating" of a capital asset, by the terms of which contract Hart was to receive no salary or other compensation for his work in managing the subdivision, or any commission on the sale of any lots sold, a joint venture was created, and the property was thereafter held primarily for sale to customers in the ordinary course of business. In his reply brief, counsel for taxpayer forthrightly concedes that if it is found that a joint venture or a partnership existed between taxpayer and Hart, then the government must prevail. Taxpayer argues, however, that certain essential elements of a joint venture, namely, an agreement to share in losses and a right of mutual control, are lacking in the arrangement. Before this contention is discussed, it should be pointed out that although the agreement specifically stated that the arrangement was not a partnership, such statement is not controlling. For tax purposes, it is the substance of an agreement and not the mere written words that determine the character of the agreement. Smith's Estate v. Commissioner, 8 Cir., 1963, 313 F.2d

724; Haley v. Commissioner, 5 Cir., 1953, 203 F.2d 815. The totality of the evidence and not just the written agreement must be looked to in order to determine whether a joint venture was entered into. Frazell v. United States, D.C. La., 1963, 213 F.Supp. 457. Whether or not a joint venture exists is a question of fact. Tate v. Knox, D.C.Minn., 1955, 131 F.Supp. 514.

 The concept of joint venture, or joint adventure as it is also termed, is of relatively recent origin in the law. 30 Am.Jur. Joint Adventures, sec. 1. In many respects it is similar to the relationship of partnership and many of the principles of partnership law are applicable to joint ventures. Blackner v. McDermott, 10 Cir., 1949, 176 F.2d 498. One of the major distinctions between the two legal relationships is that a partnership is usually created to carry on a specific type of business for profit over a long period of time, while a joint venture is usually formed for the purpose of a single business transaction. 30 Am. Jur. Joint Adventures, sec. 4.

 Some of the essential elements that must be present before a joint venture will be deemed to exist are a contract, express or implied, that a joint venture be formed; an agreement to share in the profits of the venture; the contribution of property, services, or money by the parties involved; and an agreement for joint proprietorship and control. In addition, some jurisdictions require that there be an agreement for the sharing of losses. Flanders v. United States, D.C.Calif., 1959, 172 F.Supp. 935; Tate v. Knox, supra; Annot. 138 A.L.R. 968.

 Taxpayer contends that the elements of joint control and an agreement for the sharing of losses are absent in the agreement with Hart. We are not convinced that there was such a lack of joint or mutual control as would preclude a finding that this was a joint venture. The written agreement spelled out the rights and duties of the parties. It is clear that Hart was expected to take the

necessary steps to develop and sell the property. It was he who was given the duty of entering into contracts, paying expenses, and doing all the other things necessary to develop the property. Taxpayer retained the right to approve the plat. He was aware of the manner in which the streets and grades were being constructed and approved the same. In short, he agreed that Hart should have wide latitude in developing and selling the property. From the manner in which the plat was signed and approved, the necessary title documents signed, and the money accepted for the lots, it appears that taxpayer was satisfied that the agreement was being complied with. That he may not have had as much day to day control in the activities pertaining to the development and sale of the property as did Hart does not impress the Court as being fatal to the idea of a joint venture. See, for example, Flanders v. United States, supra, 172 F.Supp. at page 943, wherein the District Court quotes the following language from 28 California Jurisprudence 2d 478, sec. 3:

" 'And, generally speaking, a joint proprietary interest in the joint adventure property and joint participation in the conduct of the business are essential elements. This is not to say, however, that there cannot be a joint venture where the parties have unequal control of operations * * *.' "

The lack of any express agreement for the sharing of losses does not appear to require a finding that no joint venture existed. First, it is not the universal rule that there be any agreement for a sharing of losses in a joint venture. There is no such requirement in Minnesota, Tate v. Knox, supra; New York, Anderson v. National Producing Co., 2 Cir., 1958, 253 F.2d 834; or Washington, Eagle Star Insurance Co. v. Bean, 9 Cir., 1943, 134 F.2d 755, to cite just a few cases. On the other hand, in a number of jurisdictions a duty to share losses must exist before a joint adventure can be found. Such is the rule in California, Balestrieri & Co. v. Commissioner, 9 Cir., 1949, 177 F.2d 867; and Missouri, Cross v. Pasley, 8 Cir., 1959, 270 F.2d 88, to cite but two cases. See 30 Am.Jur. Joint Adventures, sec. 11, and Annot. 138 A.L.R. 968.

The South Dakota Supreme Court does not appear to have ruled upon this point, since the precise issue has not been raised in any of the cases. Even if an agreement to share losses were required in this state, we do not believe that the absence of an express agreement would be fatal to the finding of joint venture in this case, since it appears abundantly clear from the agreement entered into between the taxpayer and Mr. Hart that they contemplated no losses in the development of the project. To find, as contended by the taxpayer, that the sales of the taxpayer's property was nothing more than an orderly liquidation of a capital asset, for which he was entitled to capital gains treatment on the $400 he received for each lot sold, would be to completely ignore the agreement between the parties and their acts in the development and sale of the property.

The Court is of the opinion that a joint venture for the development and sale of the property did exist between the parties. As taxpayer acknowledged, such a finding requires a decision in favor of the government. The property, although never formally transferred or deeded to the joint venture as such, became property held in the ordinary course of business by the venture and lost its character as a capital asset. The rules announced in Culley v. Commissioner, 29 T.C. 1076 (1958); and Oliver v. Commissioner, 13 T.C. Memo 67 (Docket Nos. 41084, 41085) (1954), are thus applicable.

This memorandum decision shall constitute the Court's Findings of Fact and Conclusions of Law.

Counsel for the United States of America will prepare and submit a Judgment dismissing plaintiffs' complaint upon its merits, with allowable costs to be taxed against the plaintiffs.