The Badger Company, Inc. v. Commissioner.
Badger Co. v. Commissioner
Docket No. 5517-65.
United States Tax Court
T.C. Memo 1967-178; 1967 Tax Ct. Memo LEXIS 83; 26 T.C.M. (CCH) 869; T.C.M. (RIA) 67178; August 30, 1967
Carl J. Marold and John R. Quarles, Jr., 294 Washington St., Boston, Mass., for the petitioner. Lawrence A. Wright, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined a deficiency in petitioner's income taxes of $48,388.53 for the calendar year 1961. After petitioner's concession of various issues raised by the notice of deficiency, the sole remaining question is whether petitioner is entitled to a foreign tax credit under section 901[1] for that portion of certain foreign taxes withheld from payments by Japanese licensees under certain license agreements. Findings of Fact Some of the facts are stipulated and are found accordingly. Petitioner, The Badger Company, Inc. (hereinafter referred to as "Badger"), is a Massachusetts corporation and had its principal *85 place of business at Cambridge, Massachusetts, at the time of the filing of the petition herein. Its records are maintained on an accrual basis and income tax returns are filed with the district director of internal revenue for the district of Massachusetts. Badger is a chemical engineering company in the field of process engineering. Its activity consists principally of the furnishing of designing and engineering facilities for the conversion of chemical processes to large-scale plant production. In some instances the company also does the actual construction work on such plants. It has offices in Spain, Italy, Belgium, France, Germany, Holland, and England. Sometime prior to 1957, the Standard Oil Company of Ohio, an Ohio corporation (hereinafter referrd to as "Sohio"), discovered a basic reaction of ammonia and propylene, which reaction could be used in the making of acrylonitrile (hereinafter called the "Process"), the raw material base for various synthetic fibers. In 1957, Sohio engaged Badger to make a feasibility study in order to determine whether the Process was suitable for large-scale manufacture and, if so, to design, engineer, and construct a plant for the manufacture *86 of acrylonitrile through the use of such process. During 1957 to 1959, Badger worked in cooperation with Sohio, suggesting and testing various ideas aimed at determining how to best develop the Process. Specific suggestions were tested in the Sohio laboratory in Cleveland, for the most part by personnel of Badger. As a result of this study, Badger recommended that largescale production of the Process was feasible and proceeded to design, engineer, and construct a plant for Sohio. The plant proved to be highly successful and the Process constituted a significant break-through in the industry. For both the feasibility study and the planning and construction of the Sohio plant, Badger was fully compensated by Sohio on a straightfee basis. At no time has Badger held any proprietary rights or interest in the Process. In 1959, Badger entered into an arrangement with Sohio's wholly-owned subsidiary, Prospect International, C.A., a Venezuelan corporation (hereinafter called "Prospect"), relating to the foreign promotion of the Process. This arrangement was consummated pursuant to three letters, the first of which was dated March 3, 1959 from Badger to Sohio. In this letter, Badger requested *87 that Sohio designate Badger as the exclusive engineering contractor authorized to design and construct plants for foreign licensees of Sohio utilizing the Process. The letter also contained the following: We realize that you may encounter a prospective licensee who may desire to design his own plant. However, we believe that the minimum that you should consider having us furnish in such a case is the process design, basic engineering, and advisory construction supervision. These services are often included in the royalty or license or know-how fee, and we would expect our compensation from this source. The amount of this compensation would, of course, depend on the capacity of the plant and the extent of other facilities, and we will develop a scale based on estimated plant cost which can be used as a guide. (Emphasis added.) Badger also stated that "we are willing to carry out our share of this work at our own expense." In the second letter, dated April 14, 1959, Sohio answered the Badger proposal and set forth the terms upon which it wished to deal. Sohio refused to grant Badger the exclusive right to serve as engineering contractor for the foreign plants, [2] but agreed to *88 "use every reasonable effort to obtain for you the work of preparing the over-all process design, furnishing the basic engineering and supervising the work of construction." Sohio also emphasized that, although Badger might independently take the initiative in promoting the use of "our process" in foreign countries, it was to be understood that Sohio would have sole control as to the final decision as to whether any arrangements would be entered into with a particular prospective user and what the details and terms of such arrangement would be. *89 The third and final letter, dated September 18, 1959, was sent to Badger by Prospect. After acknowledging the prior letters between Sohio and Badger, Prospect stated that Sohio had transferred to it the right to license the Process in foreign countries and that "we wish to arrange with you for certain services in connection with our foreign licensing activities." The letter went on to state the final arrangement between the parties, the salient points of which were as follows: 1. Either Badger or Prospect could promote the use of the Process in foreign countries with a view towards licensing it. 2. Only Prospect was to have authority to grant a license for the use of the Process and to determine the exact terms of such license. 3. If any such license was to be granted by Prospect, Badger, if requested by Prospect, [3] was obligated to supply the licensee a process design report for the basic design and construction of a plant for the manufacture of acrylonitrile through the use of the Process. *90 4. Any licensee was to be obligated under the license to pay both a fixed amount and periodic royalties to Prospect, one-half of the fixed amount to be payable upon execution of the license agreement and the remaining one-half payable after Badger's process design report had been delivered to the licensee. 5. Prospect was obligated to pay to Badger, immediately following receipt thereof by Prospect from the licensee, "an amount equal to one-half" of each of the fixed payments made by the licensee. If any withholding or other tax was imposed by the government of a foreign country where the license was to be used, there was to be deducted by Prospect from this amount that portion of such foreign tax fairly allocable to the amount otherwise payable to Badger. Prospect agreed that the amount payable to Badger should, in any event, not be less than "one-half the amount" set forth in an attached schedule, "the amount" to vary according to the production capacity of the particular plant. Badger was not entitled to participate in any periodic royalties paid to Prospect by the licensee, nor in any fixed payment made to Prospect by a licensee except where Prospect had called upon Badger *91 to furnish a process design report to such licensee. The precise function of Badger under this agreement was to furnish a "design package" to the licensees of Prospect. A "design package" provides information which a well-qualified engineering firm would need in order to do the detailed design and construction work on a particular plant. Prospect agreed, however, in accordance with Sohio's agreement in the second letter above, to recommend Badger to prospective licensees as to the actual construction of a particular licensed plant. Badger was to furnish engineers to assist the licensee in interpreting the process design report and to advise the licensee on the detailed design, construction, and operation of the plant. The licensee was to pay for the services of these engineers at a rate specified in the licensing agreement. Badger was to have complete discretion as to which and how many engineers in excess of four were to be furnished, as well as to the duration of any one assignment for a period beyond ninety days. The costs of preparing and supplying the "design packages" were borne solely by Badger. Other out-of-pocket expenses incurred by Badger and Prospect were to be borne *92 by them individually and were neither pooled nor allocated pursuant to a single accounting system. In those instances where Badger was to furnish engineers for the purpose of assisting a licensee, the expenses incident to such assistance (including travel) were to be borne by the licensee. After signing the above agreement, Badger sent one of its chemical engineers to Japan for the purpose of investigating companies that might be interested in putting up acrylonitrile plants. As a result of this investigation, 12 companies were recommended by Badger to Prospect as likely candidates for licensing arrangements. Seven of these were eventually licensed. Although Badger and Prospect representatives often teamed up to interview prospective licensees in connection with promotion activities in Europe, the sales negotiations for the Japanese licenses were carried on by Prospect. During 1960, Prospect granted licenses of the Process to three Japanese licensees, namely, Mitsubishi Chemical Industries, Ltd. (January 30, 1960); Nitto Chemical Industry Company, Ltd. (April 28, 1960); and Asahi Chemical Industry Co., Ltd. (March 11, 1960). The applicable license agreements by their terms placed *93 full responsibility for total performance on Prospect, including responsibility (1) to furnish the process design report prepared by Badger, (2) to cause Badger to furnish engineers to assist in interpreting such report, and (3) for its gross negligence or that of Badger in process design. Badger was not a party to these agreements. In 1961, pursuant to these licenses, each licensee became obligated and made certain fixed payments to Prospect, withholding 10 percent thereof for Japanese income taxes. The gross aggregate amount payable to the Japanese licensees was $1,190,000, of which 10 percent, or $119,000, was withheld for Japanese income taxes. Badger received $535,500 from Prospect in 1961, equivalent to one-half the gross aggregate amount less one-half the amount withheld for taxes. In its income tax return for the taxable year 1961, Badger included as taxable income $595,000 as representing its gross share of the amount payable to it with respect to the above Japanese licenses and claimed $59,500 as a foreign tax credit under section 901. Ultimate Findings of Fact The arrangement between petitioner and Prospect did not constitute a partnership, joint venture, or other *94 unincorporated business organization. Petitioner had no independent interest in the funds represented by the payments made to Prospect by the Japanese licensees. Its right to payment was founded solely on a contractual obligation of Prospect to pay petitioner from its own (Prospect') funds. The payments to petitioner by Prospect represented compensation for services rendered by petitioner to or on behalf of Prospect. Opinion Section 901 of the Internal Revenue Code provides for the allowance of a credit against Federal income tax liability for certain taxes paid to foreign countries and possessions of the United States. Section 901(b)(1) allows a credit for "the amount of any income, * * * taxes paid or accrued during the taxable year to any foreign country." (Emphasis added.) Section 901(b)(5) provides for a credit to be given to "a member of a partnership," the amount being "his proportionate share of the taxes * * * of the partnership * * * paid or accrued during the taxable year to a foreign country." [4] In determining the availability of such credit, principles *95 of American tax law are controlling. Biddle v. Commissioner, 302 U.S. 573 (1938); Arundel Corp. v. United States, 102 F. Supp. 1019 (Ct. Cl. 1952). In the instant case, there is no question but that the liability for the Japanese taxes was imposed upon the recipient of the payments and that such liability was incurred at the time of payment by the licensees. As a consequence, we are not confronted with the difficulties which have often beset the courts in cases involving the credit for foreign taxes. Compare Biddle v. Commissioner, supra; Irving Air Chute Co. v. Commissioner, 143 F. 2d 256 (C.A. 2, 1944); Abbot Laboratories International Co., 160 F. Supp. 321 (D. Ill. 1958), affirmed per curiam 267 F. 2d 940 (C.A. 7, 1959); Arundel Corp. v. United States, supra; Trico Products Corporation, 46 B.T.A. 346 (1942), affd. 137 F. 2d 424 (C.A. 2, 194(3; and Crawford Music Corporation, 40 B.T.A. 284 (1939); *96 see Owens, The Foreign Tax Credit (1961), Chapter 6. Our inquiry is a narrow one - did petitioner have a sufficient interest in the payments at the time of remittance to Prospect by the licensees to justify the conclusion that petitioner "paid" the Japanese income taxes? [5]
Petitioner contends, on two separate grounds, that, in receiving the licensing payments, Prospect served merely as a conduit for passing through to Badger its share of such payments, including its allocable share of the Japanese taxes withheld, and that consequently such taxes were actually "paid" by Badger. First, petitioner argues that the agreement between Prospect and Badger was a joint venture, and therefore a "partnership" under section 7701(a)(2). [6] On this basis, it claims that it is entitled to its proportionate share of the foreign income taxes withheld from payments by the licensee to Prospect, its co-adventurer, under section 901(b)(5). n7 Secondly, petitioner contends that, even apart from partnership considerations, the taxes on Badger's share of the license payments are attributable *97 to petitioner, since it possessed the entire economic interest in such payments and therefore it "paid" the Japanese income taxes and is entitled to credit under section 901(b)(1). Respondent disputes both grounds, asserting that petitioner was only an independent contractor which agreed to furnish services to Prospect and that the payments it received constituted nothing more than compensation for those services. Respondent takes the position that the fact that such compensation was related to certain amounts received by Prospect from the licensees did not give Badger an interest in those amounts sufficient to bring section 901 into play. We agree with respondent. *98 Whether the arrangements between Prospect and Badger constitute a joint venture and therefore a partnership under section 7701(a)(2) is a question of fact to be determined under all the circumstances in light of the intention of the parties, the language of the written agreements, and the acts of the parties in carrying out the undertaking. Hubert M. Luna, 42 T.C. 1067 (1964); Beck Chemical Equipment Corporation, 27 T.C. 840 (1957); Wm. J. Lemp Brewing Co., 18 T.C. 586 (1952). In Hubert M. Luna, supra, at pp. 1077-1078, we listed the following factors as relevant, though not necessarily conclusive, in determining whether a joint venture exists for tax purposes: The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, *99 or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise. (Emphasis added.) The facts herein clearly militate against a finding that a joint venture existed. The arrangements between Prospect and Badger, and their foundation as revealed by the letters that passed between Sohio and Badger, portary a pattern calling for rendition of services by Badger to Prospect and payment of compensation therefor by Prospect. We think that the parties clearly "contemplated a compensation status," as opposed to a partnership arrangement. See Beck Chemical Equipment Corporation, supra at p. 850. Indeed, the word "compensation" is frequently used in the exchange of letters between Badger and Sohio. *100 The arrangement was made incident to the licensing activities of Prospect. Badger was called upon to perform particular services which would enable Prospect to carry out such activities. The fact that these services may have been indispensable to the consummation of particular licensing contracts does not operate to change the character of the relationship between Badger and Prospect. Not only was full control of the licensing arrangements vested in Prospect, but Prospect assumed full responsibility of performance vis-a-vis the licensees, including performance by Badger. We see little difference between this arrangement and one in which an advertising firm provides its services for the purpose of promoting the product of another company. Badger's sole function was to supply the licensee with a design package. It was for these services - and none other - that Badger was to be remunerated. It is not without significance that the formula for remuneration was stated as "an amount equal to" one-half of certain fixed payments made by the licensees to Prospect, subject to a reduction for its allocable share of foreign taxes withheld, and was not stated in terms of a share in the payments *101 themselves. Moreover, Badger was to have no share in the "royalty" payments to be made by the licensee. Most revealing is the fact that Badger was guaranteed certain minimum payments regardless of the arrangements between Prospect and the licensees. The foregoing establishes that Badger's financial reward was not dependent upon profits from the activities. The absence of any joint treatment of expenses and the fact that the agreement was silent on the subject of losses indicate an absence of sharing of losses. While the elements of profit and loss are not determinative, they are significant factors to be taken into account. Compare Wm. J. Lemp Brewing Co., supra, with Beck Chemical Equipment Corporation, supra; cf. Fishback v. United States, 215 F. Supp. 621 (S.D.S. Dak. 1963). Nor is it relevant that Badger had previously played a substantial role in helping to develop the acrylonitrile process for commercial exploitation. Badger had been fully and separately compensated for those services. Similarly, we are not persuaded by the fact that Badger *102 was interested in the licensing activities of Prospect beyond the "design package" stage - i.e., Badger hoped to do the actual construction work on the plants of the Prospect licensees. The agreement between Prospect and Badger did not provide for such future work by Badger, except to the extent that Prospect agreed to recommend the services of Badger in this regard to its licensees. The employment of Badger for the actual construction of the plants was not a condition to the contracts between Prospect and its licensees. Further, it is clear that the sole proprietary interest in the Process - i.e., the purported "res" of the joint venture - lay with Prospect, as did the ultimate authority as to which licensees would be chosen and on what terms. We are not impressed with petitioner's suggestion that the promotional activities involved herein constituted a joint venture separate and apart from the other business operations. In any event, we need not resolve this question. The record herein is, at best, skimpy as to how the promotional activities were conducted. The testimony of petitioner's sole witness - its executive vice president - contains only broad generalizations in this regard. *103 [8] The mere fact that Badger and Prospect cooperated in the initial contacting and interviewing of prospective licensees is not sufficient to support a finding of a joint venture. Cf. Wm. J. Lemp Brewing Co., supra.
We conclude that the arrangement between Prospect and Badger did not constitute a partnership, joint venture, or other unincorporated business association and that consequently section 901(b)(5) is inapplicable. Cf. Ray S. Robinson, 44 T.C. 20 (1965). We turn now to petitioner's second contention - that, irrespective of whether a partnership or joint venture existed, Badger is nevertheless entitled to the credit, since it possessed the entire economic interest in the payments from which the tax was withheld and therefore is the "taxpayer" who "paid" the Japanese income tax within the meaning of section 901(b)(1). For the reasons stated below, we reject this contention. A foreign tax credit *104 may be taken by the taxpayer upon whom the tax to be credited is imposed. Where a foreign entity acts merely as an agent for an American entity, paying a tax to a foreign country on its principal's behalf, the credit for such taxes is available to the American principal. In such a case, the taxes have been imposed upon the income of the American principal and not upon the income of the foreign entity, which is considered merely a conduit for the payment of such taxes. Singer Mfg. Co. v. United States, 87 F. Supp. 769 (Ct. Cl. 1950); Abbot Laboratories International Co. v. United States, supra; cf. G.C.M. 19727, 1938-1 C.B. 255. The factors which are elaborated upon in our discussion of the joint venture issue militate equally against a finding that Prospect was an "agent" of Badger. Indeed, in arguing that it had an interest in the payments by the Japanese licensees sufficient to bring section 901(b)(1) into play, the principal, if not exclusive, string to petitioner's bow is its assertion that the economic burden of the foreign taxes fell upon it. But it is clear that the ultimate incidence of the burden of the foreign tax is not the determinative *105 factor. Biddle v. Commissioner, supra; Trico Products Corp., supra.Section 901(b)(1) requires that the income against which the foreign tax is imposed be the income of the taxpayer claiming the credit at the time of payment by the foreign payor. It is not enough that the burden of the tax be transmitted by arrangements in the nature of a covenant attaching after receipt of such payment by the initial recipient thereof. Petitioner relies upon Seven-Up Co., 14 T.C. 965 (1950), to sustain its position. But that case involved receipts by the taxpayer earmarked for a particular purpose by the arrangements themselves. Cf. Rev. Rul. 56-152, 1956-1 C.B. 56. We think that case is clearly distinguishable on its facts (cf. Krim-Ko Corporation, 16 T.C. 31 (1951)) and that the facts of this case fall more within the ambit of Compton Bennett, 23 T.C. 1073 (1955). Cf. Sax Rohmer, 5 T.C. 183, 190 (1945), aff'd, 153 F. 2d 61 (C.A. 2, 1946) (last issue); C. M. Peterson, 31 B.T.A. 172 (1934). *106 Nor is a different conclusion required because petitioner may have had the risk of nonpayment to Prospect by the Japanese licensees. In this regard, petitioner would be in no different position than any person whose right to payment is contingent - e.g., an attorney who renders services for a contingent fee. We recognize that a primary objective of the foreign tax credit is to alleviate the possible burden of double taxation of income. Burnet v. Chicago Portrait Co. 285 U.S. 1 (1932); Federated Mutual Implement & Hard. Ins. Co. v. Commissioner, 266 F. 2d 66 (C.A. 8, 1959). But, in reality, there is no question of double taxation herein. Japan and the United States each took only one bite out of the same income. The foundation of petitioner's position stems from its assertions that: (1) because Prospect is a foreign corporation, apparently not subject to United States tax, no one will be entitled to credit for the Japanese income tax paid with respect to the amounts which were ultimately received by petitioner and (2) if Prospect were subject to United States tax, it might be entitled to credit for the entire Japanese income tax on the gross payment by *107 the Japanese licensees, although only a portion of such gross payment would be subject to Federal income tax in its hands. [9] Assuming without deciding that petitioner's latter assertion is correct, it does not follow that this seemingly inequitable result can be obviated by giving petitioner the benefit of a portion of the credit. As Judge Learned Hand said in Shearer v. Commissioner, 48 F. 2d 552 (C.A. 2, 1931), at p. 555, in refusing a purchaser the benefit of a deduction for an excise tax passed on by a dealer in motor cars - In substance, therefore, we must agree that the only person who has suffered any diminution of what would otherwise have been an income, is the customer, and that a nicer accommodation of the tax to economic burdens would have distinguished between cases in which the tax could be shown to have been added, and those where the dealer had to bear it. But the final incidence of taxation is not a measure of the person on whom the tax is levied, and it seems to us that the form of the statute must control. * * * *108 Petitioner would have us declare that, at the time of payment to Prospect by the Japanese licensees, one-half of such payment was its (petitioner's) income. This, we are not prepared to do. Decision will be entered for the respondent. Footnotes
1. Unless otherwise stated, all references herein are to the Internal Revenue Code of 1954.↩
2. The following passages from the letter explain the reasons for such refusal: Our primary interests and objectives are to develop the use of the process in foreign countries and it is quite likely that the methods of accomplishing these may differ as between countries or as between persons or organizations with whom negotiations may be carried on. It is possible that in a particular situation our own company may desire to participate in a joint venture with a foreign concern already doing business in the particular country, or with another U.S. corporation or foreign subsidiary thereof or with several such concerns. In other cases, the negotiations may result only in the possibility of our granting a license, and possibly furnishing initial know-how, to a concern which might desire to use the process. In either of the foregoing situations, it may not be possible to persuade the other parties to the joint venture or the licensee to utilize your services in all of the respects above suggested and we do not feel that we should be placed in the position of having to insist on such a requirement.↩
3. The precise language of the September 18, 1959 letter is as follows: We propose, however, that in each case in which we actually grant a license to manufacture acrylonitrile by the Acrylonitrile Process outside the United States, and call on you to furnish a process design report to the licensee, the following arrangement shall obtain: * * * (Emphasis added.) The letter also speaks in terms of no payment to Badger except where "we [Prospect] actually grant a license to the party concerned and call on you [Badger] to furnish a process design for it to the license" and in terms of termination on December 31, 1964 "except as to licensees to whom we have asked you to furnish a process design report." (Emphasis added.)↩
4. During the years involved herein, the section was section 901(b)(4)↩. It was renumbered, without change of text, by Pub. L. 89-809, 89th Cong., 1st Sess., sec. 106(a)(4) (1966).
5. Respondent concedes that the Japanese income taxes paid otherwise qualify for the credit under section 901↩.
6. SEC. 7701. DEFINITIONS. (a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof - * * *
(2) Partnership and Partner. - The term "parnetrship" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization. n7 SEC. 901. TAXES OF FOREIGN COUNTRIES AND OF POSSESSIONS OF UNITED STATES. * * *
(b) Amount Allowed. - Subject to the applicable limitation of section 904, the following amounts shall be allowed as the credit under subsection (a): * * *
(5) Partnerships and Estates. - In the case of any individual described in paragraph (1), (2), (3), or (4) who is a member of a partnership or a beneficiary of an estate or trust, the amount of his proportionate share of the taxes (described in such paragraph) of the partnership or the estate or trust paid or accrued during the taxable year to a foreign country or to any possession of the United States, as the case may be.↩
8. We note in passing that petitioner did not see fit to call any representative of Prospect or Sohio to testify as to the nature of the arrangements.↩
9. This would presumably come about as a result of considering Prospect as the payor of the entire Japanese income tax and at the same time entitled to a deduction for the amounts paid to Badger.↩