Melbourne Ranches, Inc. v. Commissioner.
Melbourne Ranches, Inc. v. Commissioner
Docket No. 5713-66.
United States Tax Court
T.C. Memo 1971-264; 1971 Tax Ct. Memo LEXIS 68; 30 T.C.M. (CCH) 1132; T.C.M. (RIA) 71264; October 13, 1971, Filed. Lola S. Lea and Marvin W. Weinstein, for the petitioner. Marion L. Westen, for the respondent. 1133 RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies of $83,063.67 and $124,823.25 in petitioner's income tax for the taxable years ending March 31, 1962, and March 31, 1963, respectively. The only issue for decision is whether petitioner must be charged with all or merely one-half of the gain realized on the sale of a "Lease and Option Agreement" on September 8, 1961; petitioner contends that there was a joint venture between it and an individual (George Farkas) in respect of the subject matter of that sale and that it was therefore accountable for only one-half the gain in accordance with the alleged joint venture. Findings of Fact The parties have stipulated certain facts *69 which are incorporated herein by this reference. Petitioner, Melbourne Ranches, Inc. ("Melbourne"), is a Florida corporation. It filed Federal corporate income tax returns for the taxable years ending March 31, 1962, and March 31, 1963, with the district director of internal revenue at Jacksonville, Florida. At the time the petition herein was filed, Melbourne's legal address and principal place of business was 1010 First National Bank Building, Miami, Florida. Melbourne was organized under the laws of the State of Florida, and its Articles of Incorporation were filed with the Secretary of State in Tallahassee on May 20, 1955, with an authorized capital of 10,000 shares of $10 par value common stock. Its stock was initially issued to the following persons in the following amounts: Percentage
Relationship of
Name of
Number of
of Stock
Shareholder to
Shareholder
Shares
Ownership
George Farkas
Alexander S. Farkas
300
15.0%
Son
Robin L. Farkas
300
15.0%
Son
Bruce R. Farkas
300
15.0%
Son
Jonathan D. Farkas
300
15.0%
Son
Arthur W. Schwadron
170
8.5%
Nephew
Jack Schwadron
170
8.5%
Nephew
Ruth Lewis Farkas
120
6.0%
Wife
Rubin D. Lewis
100
5.0%
Brother-in-law
Jack Hartley
80
4.0%
Nephew
Kate Spaget
80
4.0%
Sister
Alice Sherwin
40
2.0%
Niece
Marion Tenner
40
2.0%
Niece
*70 As indicated by the table above, all of the stockholders were related by blood or by marriage to George Farkas ("Farkas"). Farkas was the founder of Alexander's Department Stores, Inc. ("Alexander's"), a New York based chain of retail department stores which he began in 1928 with funds contributed by himself, his sisters, and his brothers-in-law. Until 1968, when stock of Alexander's was sold to the public, the enterprise was owned almost entirely by Farkas and his relatives; and until his retirement in 1968, Farkas devoted himself to Alexander's largely on a full-time basis. Beginning in about 1937, Farkas began to acquire interests in real estate in Florida on behalf of himself, his wife, and other family members. Although there were variations, Farkas generally retained a 51 percent interest in each real estate venture; his wife generally held an eight percent interest; one sister (Mrs. Schwadron) held approximately a 22 percent interest; and his three other sisters each held 6 percent interests. These percentage interests were substantially identical to the family members' interests in Alexander's. Farkas was the sole family member who actively participated in the selection *71 of and negotiation for the Florida properties. He was assisted in making such investments by J.P. Simmons ("Simmons"), a Florida attorney. Simmons began representing Farkas (and the family interests) in 1937 or 1938 in connection with the Florida investments and continued to do so until his death in 1961. At a time not clearly disclosed by the record herein, Farkas learned that a parcel of realty consisting of about 45,000 acres in Brevard County, Florida, was being held for sale by F. Marion Platt and his wife, Lorena. Farkas approached the Platts with an offer for the property. During his negotiations with the Platts, Farkas assured them that, under the arrangement he proposed, they could remain in possession of the property for the next 20 years. On April 15, 1955, Farkas entered into an agreement entitled "Lease and Option Agreement" with the Platts for the acquisition of the Brevard County property. Under the 1134 agreement Farkas agreed to make annual "rent" [1] payments to the Platts from 1955 through 1974 in the aggregate amount of $662,500; the Platts gave Farkas an option to purchase the property for $650,000 at any time during the running of the "lease"; and the Platts *72 reserved the right to the exclusive use of the land for farming, grazing, the growing of timber and any other agricultural pursuits for the full term of the "lease". At about the time of the execution of the "Lease and Option Agreement", Farkas advised Simmons that he wished to retain a 50 percent interest in the real estate investment and that he wanted the remaining 50 percent to be held by other family members. Simmons recommended that the agreement be assigned to a corporation, that Farkas hold no stock in such corporation, and that Farkas retain a right to 50 percent of the proceeds from the investment. Accordingly, the "Lease and Option Agreement" provided that Farkas reserved the right to cause to be formed a Florida corporation and to assign "all his right, title and interest" under the agreement to the corporation which would assume all of his obligations under the agreement: The Lessee reserves the privilege of causing to be formed a Florida *73 corporation and reserves the right to transfer, assign, convey and set over all his right, title and interest under the terms of this lease and option agreement to said corporation, which said corporation the Lessee herein shall cause to assume and agree to perform all terms, conditions, stipulations and covenants on the part of the Lessee under this lease and option agreement on his part to be performed, and such assignment upon being recorded and upon the furnishing of a certified copy of said recorded assignment to the Lessors the Lessee then and there shall be released, from all personal and individual financial responsibility and all other liability of the Lessee under the terms of this lease shall cease and be at an end, and all of such liability shall henceforth be the obligations and responsibilities of said corporation. * * * Shortly after the execution of the agreement, Melbourne was organized. From 1955 until 1961 the officers and directors of Melbourne were as follows: J.P. Simmons President and Treasurer John Chowning Vice President and Assistant Secretary L.C. Childress Secretary and Assistant Treasurer Simmons handled Melbourne's day-to-day affairs. Chowning *74 and Childress were associated with Simmons' Florida law firm. Melbourne's original stockholders, who were all related to Farkas by blood or by marriage, see p. 1133, supra, did not make cash payments with respect to their stock prior to 1957. The amount due for the stock was reflected in the books of the corporation as an account receivable. Payments with respect to Melbourne's stock were made as follows: Sept. 9, 1957 R. L. Farkas
$1,200.00
R.D. Lewis
1,000.00
M. Sherwin
400.00
M. Tenner 400.00
[2] $3,000.00
Aug. 27, 1958 Kate Spaget for
(a)Constance Meizlish
800.00
(b) Marilyn Babin 800.00
$1,600.00
Apr. 18, 1960 J.D. Farkas
$3,000.00
R. L. Farkas
3,000.00
B. R. Farkas 3,000.00
$9,000.00
May 31, 1960 A. S. Farkas
$3,000.00
J. Schwadron
1,700.00
A. Schwadron 1,700.00
$6,400.00
By a written instrument dated July 27, 1955, Farkas and his wife, Ruth Lewis Farkas, assigned to Melbourne "all of their right, title and interest whether legal or equitable in and to" the so-called "Lease and Option Agreement". The *75 assignment instrument was filed and recorded in the Public Records of Brevard County, Florida, on February 6, 1957. When Farkas assigned the agreement to Melbourne, he intended to retain a 50 percent beneficial interest in the real estate investment. Melbourne, directly or indirectly, made all of the payments to the Platts in connection with the acquisition of the Brevard County property under the "Lease and Option Agreement". The funds for such payments were provided (in a manner not clearly disclosed by the record herein) by a number of corporations which were owned substantially by Farkas 1135 and his relatives. Farkas was the president and treasurer of each of such corporations. By an instrument entitled "Lease Agreement" and dated July 29, 1955, Melbourne entered into a "sub-lease" arrangement with Biscayne Realty Corporation ("Biscayne"). Biscayne was a New York corporation owned by the Farkas family; Farkas was its president. The term of the "Lease Agreement" was coextensive with the 20-year term of the Platts' "lease" to Melbourne. The agreement called for a "security deposit" of $100,000 and an annual "rental" of $60,000. The "Lease Agreement" was signed by Simmons *76 on behalf of Melbourne. Farkas was not a party to the agreement with Biscayne. On its Federal corporate income tax returns for the taxable years ended March 31, 1956, through March 31, 1959, Melbourne reported as rental income in each year the full amount of the $60,000 "rental" payments it received pursuant to its agreement with Biscayne. [3] With one exception, each of those returns was signed by Simmons; each was prepared by a firm of certified public accountants. On the returns filed by Farkas during the same period no part of the $60,000 payments was included in gross income. In late 1956 or early 1957 Farkas negotiated with Lock Davidson for *77 the sale of a portion of the Brevard County property to Tropicana, Inc. ("Tropicana"), a Florida corporation of which Davidson was president. Sometime in early 1957, Melbourne exercised its option to purchase under the agreement with the Platts to the limited extent of approximately 1,600 acres. An agreement between Melbourne and the Platts provided for a purchase price of approximately $30,000. The agreement was signed by Simmons on behalf of Melbourne. At the bottom of the agreement Farkas signed his name below the following paragraph: The negotiations for the above agreement were handled by the undersigned and have my approval. The undersigned joins in the request to the Vendors that they execute a deed to the County of Brevard, Florida, for the road which is an extension Southerly of Babcock Street in the City of Melbourne, Florida, on the terms and conditions as set forth hereinabove. By a deed, dated February 1, 1957, which was recorded in the public records of Brevard County, the Platts conveyed to Melbourne the 1,600-acre property just described. On October 24, 1957, Melbourne and Tropicana entered into an agreement whereby Melbourne agreed to sell and Tropicana agreed *78 to buy all of the property which Melbourne had acquired from the Platts on February 1, 1957. The agreement was signed by Simmons on behalf of Melbourne and by Davidson both personally and on behalf of Tropicana. Farkas was not a party to the agreement. On November 13, 1957, Melbourne executed a warranty deed conveying the property to Tropicana. As consideration for the conveyance, Davidson, on behalf of Tropicana, executed a purchase money mortgage and a promissory note, dated November 15, 1957, in the amount of $785,000. The note and mortgage called for four annual payments of $196,250, commencing on November 15, 1958. On its Federal corporate income tax returns for the taxable year ending March 31, 1958, Melbourne elected to report its gain on the sale to Tropicana on the installment method pursuant to section 453, I.R.C. 1954. On its income tax returns for the taxable years ending March 31, 1958, through March 31, 1963, Melbourne included in gross income all of the proceeds stemming from the sale of the property and paid all of the tax attributable to such proceeds. As of March 31, 1963, Melbourne had reported gain from the sale of the property in the aggregate *79 amount of $373,109.94. On his Federal income tax returns filed during this period, Farkas did not include any of the proceeds stemming from the sale in gross income. Nor did he pay tax attributable to any part of the gain from the sale. A "Property Management Agreement", dated as of August 14, 1958, between Melbourne and Simmons Bond and Mortgage Company ("Simmons Bond"), was executed by Simmons as president of each organization. Farkas was not a party to the agreement. Under the instrument, Simmons Bond was engaged to manage Melbourne's properties and to represent it in connection with the sale of its properties. In return, Melbourne agreed to pay Simmons Bond a two percent commission on 1136 both past and future sales of its property and guaranteed it a minimum income of $12,000 per year for eight years, commencing January 1, 1959. On at least some of its subsequent income tax returns Melbourne claimed deductions with respect to such commissions. The record does not disclose that any such deductions were claimed by Farkas on returns filed by him. By an agreement, dated December 17, 1958, the note and mortgage previously received from Tropicana were modified by Melbourne *80 and Tropicana. As a result of that agreement, Tropicana substituted two mortgages for its original $785,000 mortgage: one in the amount of $115,000, on which Tropicana retained liability, and another in the amount of $670,000, which was assumed by Heathcote Land Company ("Heathcote"). Heathcote was another Farkas family corporation of which George Farkas was president. Tropicana conveyed to Heathcote the portion of the property covered by the $670,000 mortgage. On or about January 12, 1959, and before Heathcote had made any payments to Melbourne in respect of the $670,000 mortgage, Heathcote sold the mortgaged property to General Development Corporation ("General Development"), a Delaware corporation. General Development assumed liability on the $670,000 mortgage and agreed to pay that sum at the rate of $67,000 per year for ten years. At about the same time Melbourne and Biscayne cancelled the agreement between them under which Biscayne had been obligated to pay Melbourne $60,000 per year for 20 years. In January of 1959 Farkas and Simmons negotiated an agreement, dated January 15, 1959, calling for the sale to General Development of the "Lease and Option Agreement" with the Platts. *81 Subject to certain allowances and adjustments, the total purchase price was to be $16,500,000. The agreement called for (1) an escrow deposit of $100,000 to be paid to Simmons' law firm as escrow agent at the time of the contract, (2) payment of $1,500,000 less certain credits at the time of closing, and (3) the balance to be represented by a note and mortgage. By a letter dated January 12, 1959, and addressed to General Development, Farkas requested that General Development pay directly to Melbourne the $100,000 deposit required by the agreement to be paid to Simmons' law firm as escrow agent; in addition, he personally guaranteed repayment of the $100,000 to General Development if it ever became entitled thereto and Melbourne failed to repay such amount. Melbourne and General Development subsequently executed agreements dated June 12, 1959, and February 10, 1960, modifying the January 15, 1959 agreement between them. Neither of these agreements was executed by Farkas. The closing with General Development[4] occurred on September 8, 1961. The adjusted purchase price was $14,602,546.60, payable $679,805 in cash, together with two purchase money notes in the aggregate amount of $13,922,741.60 *82 secured by a purchase money mortgage. By the terms of the assignment instrument, Melbourne represented that it was the owner of the "Lease and Option Agreement" and that it had the power and authority to effect its sale and transfer. The assignment was executed on behalf of Melbourne by its then current president, Alexander Farkas. George Farkas did not join in the execution of the assignment. At some time prior to the closing a bitter dispute developed between George Farkas on the one hand and his sisters and their families on the other hand. The dispute arose in connection with the management of the affairs of Alexander's and involved the sale by the sisters' families of Alexander's stock to Alexander's competitor, E. J. Korvette; some family members also left their positions at Alexander's and accepted executive positions with Korvette. Prior to the outbreak of the quarrel, Melbourne had held no stockholder or board *83 of directors meetings; Melbourne's stockholders had neither sought nor been given financial statements or other information about Melbourne's affairs. However, the family dispute enveloped the affairs of Melbourne. Family members who held stock in Melbourne and who were aligned against George Farkas instituted a lawsuit in Florida, naming as defendants Farkas, stockholders who were aligned with him, General Development, and Melbourne. The complaint alleged in part as follows: 6. That George Farkas and other of the defendants at all times material to this cause have been engaged in the mercantile business in New York, as have certain of the plaintiffs herein. On 1137 several occasions George Farkas, acting on his own behalf and on the behalf of some or all of the individual defendants * * * has prevailed upon some or all of the plaintiffs herein and/or their relatives to join him in business ventures involving the purchase and sale of different parcels of real estate in the State of Florida. These joint ventures, for convenience of the parties, have usually taken the form of a Florida corporation and in substantially all instances separate Florida corporations have been formed *84 for each parcel of real estate acquired. 7. That some time prior to June 1, 1955, George Farkas negotiated a twenty-year lease with option to purchase of 43,000 acres of land situate in Brevard County, Florida * * *. 8. Thereafter, the said George Farkas, acting on his own behalf and on the behalf of the other individual defendants * * * requested plaintiffs, * * * to participate in the acquisition and sale of the aforementioned lease and leasehold property. Plaintiffs * * * thereafter agreed with the said George Farkas to participate in the venture, it being understood that the lease and leasehold property and option to purchase was being acquired as a joint investment to be held for resale. As in the case of other transactions between the plaintiffs and/or their relatives and George Farkas as outlined above, the details of the transaction were left to George Farkas, who was represented by Florida counsel. Whereupon, George Farkas arranged for the incorporation of Melbourne Ranches, Inc., a Florida corporation, to take title to the aforesaid lease and option to purchase. * * * 10. Mebourne Ranches, Inc. was organized as a convenience to the plaintiffs and Kate Spagat and the *85 individual defendants [including George Farkas] who were the joint purchasers of the lease and option to purchase here involved, and said corporation was organized for the sole purpose of effectuating the joint venture of the plaintiffs and Kate Spagat and the individual defendants [including George Farkas] with respect to the purchase and sale of said lease and real estate. * * * George Farkas, who was the promoter of the venture, dominated and controlled the venture, and Melbourne Ranches, Inc. was a corporation in name only. Mr. Simmons died in 1961 and was succeeded as President and Treasurer by Richard M. White, an attorney in Mr. Simmons' law firm. The relief sought in the complaint included a request for an accounting with respect to both Melbourne and the interests of the plaintiffs and defendants therein. In October of 1962 the factions settled their dispute with regard to Melbourne. They entered into a settlement agreement, dated October 11, 1962, which was executed by Bruce Farkas on behalf of Melbourne, by George Farkas, and by seven of Melbourne's shareholders. It recited that Melbourne held two notes and a mortgage deed executed by General Development and that *86 - the Notes and Mortgage Deed are, in fact, owned by a joint venture in which FARKAS and MELBOURNE each has a fifty percent beneficial interest, and MELBOURNE holds record title to the Notes and Mortgage Deed for convenience and other reasons * * *. Under the settlement agreement, the Florida litigation was to be discontinued, and seven of Melbourne's stockholders (including all of those named as plaintiffs in the Florida lawsuit) agreed to sell their stock back to the corporation. The selling stockholders held 29 percent of Melbourne's stock. They were to be paid a total of $2,400,000, payable over an eight-year period out of the proceeds of Melbourne's sale to General Development (which amounted to approximately $14,600,000). Pursuant to the settlement agreement, the General Development notes and mortgage were turned over to the First National Bank of Miami as Trustee, and it has disbursed the proceeds thereof to Melbourne, to the selling stockholders, and to Farkas since 1962. In 1959 or 1960 Alexander Farkas transferred 300 shares of Melbourne stock to Henry Rosenfeld ("Rosenfeld"). Rosenfeld was not a member of the Farkas family. At the time he acquired the shares, Rosenfeld *87 understood that Melbourne and Farkas each held 50 percent interests in the Brevard County real estate. After transferring a portion of the stock to others, Rosenfeld held 138 shares of Melbourne stock. In 1963 Rosenfeld sold his stock back to Melbourne in return for the total amount of $561,816. The agreement of sale expressly recited the existence of a joint venture between Melbourne and Farkas; and the $561,816 sale price was established on the basis of Farkas' purported 50 percent interest in the venture. On its Federal corporate income tax returns for the taxable years ending March 31, 1962, and March 31, 1963, respectively, Melbourne included in gross income $332,254.70 and $499,293, which it reported in each year as its 50 percent share of the gain realized on the sale to General Development. 1138 On their joint Federal income tax return for the calendar year 1961, George and Ruth Farkas reported that "taxpayer was part owner of a parcel of real estate in Melbourne, Florida," that the "property" was sold during 1961, that the taxpayer's basis in such property was zero, and that he elected "to report his share of the gain on the installment basis" under section 453. *88 The Farkases' return reported a "total selling price" of $14,602,546.60, "gross proceeds received 1961" of $679,805, and "taxpayers share of net proceeds (100% gain)" of $200,000. On their joint return for 1962, George and Ruth Farkas reported the following with respect to the 1961 sale: Gross sale price
$7,301,273.30
Basis of property
109,009.35
Gross proceeds
657,298.91
Capital gain recognized in 1962 (97.75% profit)
586,821.71
Both the 1961 and 1962 returns were prepared by the firm of Touche, Ross, Bailey & Smart. In his statutory notice of deficiency to petitioner, the Commissioner determined that Melbourne had realized all of the gain from the sale of the "Lease and Option Agreement" and not simply the 50 percent of such gain which it had included in gross income. Opinion RAUM, Judge: The issue for decision is whether Melbourne must be charged with all of the gain realized on the sale of the "Lease and Option Agreement" to General Development. Melbourne contends that pursuant to an oral joint venture agreement with George Farkas it was entitled to only 50 percent of such gain and that accordingly it must include only one-half of the gain in its *89 gross income. The Commissioner's position is that Farkas assigned his entire interest in the "Lease and Option Agreement" to Melbourne, that no joint venture between Farkas and Melbourne was ever established, and that therefore Melbourne must be charged with all of the gain realized on the sale to General Development. The question of the existence of a joint venture is essentially factual. All of the facts and circumstances, and not just the written agreements, must be examined. See Commissioner v. Culbertson, 337 U.S. 733, 742; S. & M. Plumbing Co., 55 T.C. 702, 707; Fishback v. United States, 215 F. Supp. 621, 625 (D.S.D.); cf. Beck Chemical Equipment Corp., 27 T.C. 840; Morris W. Zack, 25 T.C. 676, affirmed per curiam, 245 F. 2d 235 (C.A. 6); Morris Cohen, 15 T.C. 261, 271-273; Carl G. Dreymann [Dec. 16,526], 11 T.C. 153.[5] The record herein contains substantial evidence to support both the position of Melbourne, that a joint venture was formed, and the position of the Government, *90 that such a venture was not established. We have carefully reviewed the record as a whole, and although the matter is by no means free from doubt, we have concluded that petitioner has met its burden of proof and has established the existence of a joint venture. It would serve no useful purpose to enumerate all of the considerations upon which our decision is based. However, we do note the following: Farkas initiated and organized the real estate venture; none of the other family members played any active part in it until 1961. In 1957 Farkas subscribed to the agreement whereby Melbourne undertook to purchase and the Platts agreed to sell some 1,600 acres of the Brevard County property. In 1959 Farkas personally guaranteed repayment of General Development's $100,000 security deposit if General Development ever became entitled thereto. When he acquired stock in Melbourne in 1959 or 1960, Rosenfeld understood that Farkas had a 50 percent interest in the venture. The settlement agreement, executed by Melbourne, Farkas, and seven of Melbourne's dissenting stockholders in 1961, expressly recognized the existence *91 of a joint venture between Melbourne and Farkas, and established a price for the stock which generally reflected Melbourne's 50 percent interest in the venture. Similarly, the price paid to Rosenfeld when he sold his stock back to Melbourne in 1963 was also established on the basis of Melbourne's 50 percent interest in the real estate venture. Finally, we note that on their Federal income tax returns for the 1961 and 1962 calendar years Farkas and his wife included in their gross income a total of $786,821.71 as capital gain attributable to Farkas' interest in the real estate venture. [6] 1139 To be sure, there is also considerable as well as troubling evidence supporting the Commissioner's position. The 1955 assignment instrument whereby Farkas and his *92 wife assigned their interest in the "Lease and Option Agreement" expressly provided for an assignment of "all of their right, title and interest whether legal or equitable in and to" the agreement. Moreover, for six years, from the taxable year ended March 31, 1956, through the taxable year ended March 31, 1961, Melbourne included all income realized with respect to the Brevard County property in gross income on its Federal income tax returns; during the same period no portion of such income was included in the Farkases' gross income. Similarly, insofar as the record discloses, deductions relating to the property during this period were claimed by Melbourne and not by the Farkases. We have considered the foregoing as well as other evidence tending to support the Commissioner's position. However, on balance and in light of the record as a whole we conclude, without strong confidence, that a joint venture between Farkas and Melbourne was established and that Melbourne's position herein must be sustained. [7]
*93 Decision will be entered for the petitioner. Footnotes
1. The words "rent" and "lease" and like terms as used by the parties are enclosed in quotation marks in order to avoid any implication that the unusual arrangement herein involved a lease as that term is commonly understood.↩
2. The Supplemental Stipulation of the parties inexplicably shows the sum of the four foregoing figures as $6,400.↩
3. On Melbourne's returns for the taxable years ending March 31, 1956 and March 31, 1957, the $60,000 payments were the only items included in gross income; and after claiming deductions for "rents", interest, taxes, and amortization of organization expenses and leasehold costs, Melbourne reported taxable income of $27,521.97 and $25,191.46 for each of those years, respectively. The record does not disclose that any such deductions relating to the Brevard County property were claimed on returns filed by Farkas during this period.↩
4. General Development had meanwhile assigned its right to purchase the "Lease and Option Agreement" to Port Malabar, Inc., a wholly owned subsidiary. However, for purposes of simplicity the purchaser will continue to be referred to as "General Development."↩
5. Cf. Hubert F. Baughn, 28 T.C.M. 1447↩, P-H Memo. 69-1559.
6. At the trial herein, petitioner presented the testimony of Farkas, Charles Ellis, an accountant, and John S. Chowning, an attorney. Their testimony related in part to various out-of-court statements made by J. P. Simmons prior to his death in 1961. To the extent that such testimony was designed to prove the truth of any of the statements allegedly made by Simmons, we have not relied upon it in arriving at our decision.↩
7. In view of our disposition of this case we need not consider petitioner's alternative argument that it was entitled to deductions for amounts received by Farkas during its 1962 and 1963 taxable years.↩