Hubert F. Baughn and Leila F. Baughn, Petitioners v. Commissioner. Joe T. Barton and Ruth D. Barton, Petitioners v. Commissioner.
Baughn v. Commissioner
Docket Nos. 1548-68, 2049-68.
United States Tax Court
T.C. Memo 1969-282; 1969 Tax Ct. Memo LEXIS 16; 28 T.C.M. (CCH) 1447; T.C.M. (RIA) 69282; December 22, 1969, Filed Joe T. Booth, III, and Richard J. Grassgreen, 808 S. Lawrence St., Montgomery, Ala., for the petitioners in docket No. 1548-68. Joe T. Barton, pro se, 2368 Carlton St., Montgomery, Ala. Robert D. Hoffman, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: In these consolidated cases respondent determined income tax deficiencies and additions to tax against *18 the petitioners as follows: *10
Docket
Addition to Tax
Petitioners
No.
Year
Deficiency
§6653(b)
§6654(a) [1]
Hubert F. and Leila F. Baughn
1548-68
1960
$34,450.26
$ 17,225.13
1961
34,823.53
17,411.77
1962
9,194.17
4,597.09
Joe T. and Ruth D. Barton
2049-68
1960
30,741.03
15,370.52
1961
27,719.04
13,859.52
$119.87
1962
5,460.97
By amendments to his answers respondent has asserted the following additional deficiencies on alternative grounds: Docket
Additions to Tax
Petitioners
No.
Year
Deficiency
Sec. 6653(b)
Hubert F. and Leila F. Baughn
1548-68
1960
$24,254.82
$12,127.41
1961
19,228.69
9,614.34
1962
5,254.66
2,650.26
Joe T. and Ruth D. Barton
2049-68
1960
71,202.40
35,601.20
1961
66,275.94
33,137.97
1962
15,587.24
10,524.10
The two principal issues for decision are (1) whether Hubert F. Baughn and Joe T. Barton failed to report all of their respective shares of income derived from a road striping contract with the State of *19 Alabama during 1960, 1961, and 1962, resulting in understatements of taxable income for such years; and (2) whether any part of the underpayment of tax in each of the years was due to fraud with intent to evade tax. In docket No. 1548-68 we must also decide the following questions: 1. Did the relationship between Hubert F. Baughn and Howard Sadler constitute a partnership within the meaning of section 7701(a) (2)? 2. If no partnership existed, were the amounts which Baughn permitted Sadler to retain from the Alabama Marking & Sign Company deductible as ordinary and necessary business expenses by Baughn under section 162 in each of the years involved? 3. If such amounts are not deductible as ordinary and necessary business expenses, did Baughn lack the requisite dominion and control over the amounts admittedly received by Sadler from Alabama Marking & Sign Company in each of the years in issue so that such amounts are not income to Baughn in those years? 4. Does the statute of limitations bar assessment of the deficiency in the income tax of Hubert F. Baughn and his wife for the year 1961? Findings of Fact These consolidated cases were submitted almost entirely on the *20 basis of the stipulated statements of Hubert F. Baughn and Joe T. Barton. These statements were given to respondent's agent on July 1, 1963, in the office of Richmond Flowers, then Attorney General for the State of Alabama. Present at that time were William S. Duke and Joe T. Booth, III (attorneys for Baughn and Barton), and Joe Gantt (Assistant Attorney General of Alabama). At the time he received the statements, respondent's agent was investigating the activities of Baghn and Barton for possible criminal tax prosecution. The stipulations of facts, containing these statements and exhibits, are incorporated herein by this reference. Hubert F. Baughn and Leila F. Baughn are husband and wife who had their legal residence in Birmingham, Alabama, at the time their petition was filed herein. They filed joint Federal income tax returns for the years 1960, 1961, and 1962 with the district director of internal revenue at Birmingham, Alabama. Joe T. Barton and Ruth D. Barton are husband and wife. Their legal residence was Montgomery, Alabama, at the time they filed their petition in this proceeding. Their joint Federal income tax returns for the years 1960, 1961, and 1962 were filed with *21 the district director of internal revenue at Birmingham, Alabama. In early 1959, Joe T. Barton (herein called Barton) became interested in obtaining a contract from the State of Alabama to paint the traffic lines or markings (herein referred to as striping) on the State's roads and highways. To get the contract, Barton solicited the assistance of Harold Purdy, a man Barton knew to be a "favorite of the Administration." As it turned out, Purdy had already received all the patronage the Administration was going to give him. He was unable to help Barton, except for the suggestion that Barton see Hubert F. Baughn (herein called Baughn), who had worked hard in the previous election, but who, according to Purdy, had not at that time received any "favors" from the Administration. Sometime during the summer of 1959, Barton contacted Baughn in Montgomery, Alabama, to get his help in obtaining a contract from the State to stripe the highways 1449 on a negotiated basis. Baughn owned and published the South News Magazine in Birmingham. Prior to this meeting Barton had known Baughn casually for several years. On this particular occasion, Baughn indicated he was busy, but he would discuss *22 the matter further with Barton at a later time. Subsequently, the two met on various occasions to discuss further the matter of the road striping contract. In late 1959, after a number of discussions with Barton, Baughn disclosed to Sam Engelhardt, the State Highway Director, Barton's interest in painting the traffic lines on the highways and asked him about the State's plans with respect to road striping. Engelhardt responded that he did not know what the Department's plans were but that he thought any contract for such work would be let on a competitive bid basis. In the past Alabama had used convict labor to stripe the highways and there was some doubt whether the State would contract the work out to a private contractor. Baughn was frequently in Montgomery and while there he came into contact with Engelhardt and Walter Craig (herein called Craig), the assistant director of highways. Once while Baughn was at the Highway Department, Craig approached him and indicated he had given considerable thought to the proposition of having a private contractor stripe the roads and he "could see great possibilities for some of us." At one point during their discussions, Craig asked Baughn *23 how much he thought it would cost Barton to do the work and "how much money could be made out of it." Baughn replied he did not know and suggested that they meet with Barton to discuss the matter. Late in 1959, Craig, Baughn, and Barton met in Craig's office to discuss the road striping contract. Prior to such meeting, Barton had never met Craig. At the time of the meeting it was not known if the State would negotiate the contract or if it would be let on a competitive bid basis. During the course of their discussions Craig made it clear to Barton that "he [Barton] did not mean a thing to the Administration," and that it would be necessary for him "to play ball" with Baughn if he expected to get any business. Craig also made it clear to both Baughn and Barton that he was going to get a share of the profits or there would be no work ordered under the proposed contract. Baughn assured Craig that he thought he could handle Barton and, if they could get the contract, he would make sure that Craig got part of the profits. In either December 1959 or January 1960, Craig discovered that the State was not going to negotiate the contract but instead was going to let it on a low bid basis. *24 Even under these circumstances - the letting of the contract on a competitive bid basis - Craig was confident he could handle the matter. Acting in accordance with Craig's directions, Barton procured letters from four of his friends who were contractors in which each indicated an interest in striping the roads and quoted a price for which they would do such work. In each instance Barton suggested the quoted bid price submitted by the four contractors. None of the contractors, in fact, wanted the contract. The "bids" were merely submitted as a favor to Barton. The "phony" bids submitted by Barton's contractor-friends were as follows: Contractor
Bid price per mile of striping
Montgomery Construction Co.,
Inc.
$46.00
Mobile Car Spacing Co.
39.75
W.S. Newell Construction Co.
45.00
DuBose Construction Co.
42.00
As a result of the collusive bidding arrangement, Barton knowingly prepared and submitted the low bid of $39.50 per mile in the name of Alabama Marking & Sign Company (herein sometimes referred to as the company). Craig knew of, and participated in, the collusion. When Barton handed Craig the bids, Craig asked if his bid was low. Barton replied that *25 he was low as to these particular bids. "Well, Bud," Craig responded, "we are in business." The next day Barton received word through Baughn that Craig wanted to see him right away. When Barton reached Craig's office, Craig said: "Joe, you damn fool, all these * * * bids are dated the same date! It look like hell! We've got to fix it!" All of the letters were dated February 2, 1960. To correct this mistake Barton had to go to each of the contractors and have them change the date on their respective letters. The "bids" were then redelivered to Craig. In February 1960, the State of Alabama awarded a contract bearing the date of February 3, 1960, to the company to paint the traffic lines on the State's highways and 1450 roads at a price of $39.50 per mile. The contract provided, in pertinent part, as follows: The State Highway Department desires to enter into an agreement for the application of certain painted traffic lines as described below in any or all of the Divisions of the Highway Department at such time and such mileage, as directed by the Divisions. Craig intentionally wrote the contract with the above provision so he could have a measure of control over the whole *26 operation. Barton, worried that he would be required to move all over the State and that he would not get sufficient mileage under the contract to make any money, pleadingly beseeched Baughn that he needed his help more than ever. In response to Barton's entreaty, Baughn responded: Joe, I don't believe that they would have let the contract unless they intended to do some painting under it. Craig is handing this matter, and I thing that we had better get in touch with him and work out an arrangement on it. We've got to reach some agreement with him on what we are going to do in this matter. I want to know how much you can pay Craig, how much I am going to get out of this thing, and just what the details are, Joe? Shortly thereafter, at a meeting among the three, Craig disclosed that the contract had been purposefully written because that was how he wanted it. "As long as you play ball with me," Craig warned Barton, "you'll get the miles. But I can cut you off at any time I want to, and you had better keep in close touch with me and Baughn." Once Barton had obtained the contract to stripe the roads, he contracted the actual work thereunder out to Safety Equipment Company, Inc. *27 , or to Howard Williams, its controlling stockholder, at a price of $20 per mile. After this had been done, at a meeting between Barton and Baughn, it was decided that Barton was to receive $7.50 per mile of the remaining $19.50 per mile [the profit per mile after paying the subcontractor], Baughn $7 per mile and Craig $5 per mile. In agreeing to this allocation of the profits, Craig told Baughn that he would take care of Barton getting the mileage. On April 4, 1960, Barton opened a checking account in the name of Alabama Marking & Sign Company at the Union Bank and Trust Company in Montgomery, Alabama. In the top right hand corner of the signature card signed by Barton were the words "individual ownership." The card also contained the following sentence: The signature appearing below is the authorized signature of , an individual proprietorship owned and operated by , which you will recognize in the payment of funds and the transaction of other business for our account. Checks, drafts, and notes must bear 1 of the within signatures. The only signature appearing on the signature card was that of Barton. Beginning in March 1960, and at all times material to the issues herein, *28 Barton received oral instructions as to the number of miles to be painted under the contract directly from Craig or certain maintenance engineers of the Highway Department. The instructions were never written. At the end of each month Barton billed the State for the miles striped during the month. The monthly statements were personally handed to Craig or his secretary in a sealed envelope. They were never sent by mail. Each month the company received a check for the previous month's striping. Barton deposited the checks in the company's checking account. To prevent disclosure of Craig's participation in the enterprise, Barton issued checks drawn on the company's account to various individuals whose only function was to cash the checks and remit the proceeds either to Barton or Baughn who in turn delivered them to Craig. For each of the years in issue, partnership returns, Form 1065, were prepared and filed in the name of Alabama Marking & Sign Company. On these returns the individuals to whom the checks were issued to channel money to Craig were fictitiously listed as partners. The partnership returns for 1960 and 1961 were prepared by Byron Cooper and for 1962 by Joe T. Booth, *29 III, one of Baughn's attoneys. These returns were signed and filed by Barton. Baughn directed Barton to make the checks for his $7 per mile share payable to Howard Sadler, the brother of a friend of his. But after the issuance of the first check, Sadler asked Baughn to have subsequent checks made out to Howard Sadler and Associates. This was done. According to the somewhat loose understanding between Sadler and Baughn, Sadler was to receive monthly checks from the company, deposit them in his account, and then issue a check to Baughn as Baughn directed. Under the agreement Sadler was to retain a portion of 1451 the proceeds from the checks he received and deposited in the bank. At the outset Sadler was supposed to get 40 percent of such proceeds and Baughn the remaining 60 percent. As it actually turned out, however, Baughn got more than 60 percent. At their monthly meeting Baughn "would explain to [Sadler] certain expenses that had been incurred from time to time, and point out to him that he had to bear a part" thereof. Then Baughn "would tell [Sadler] to write him a check for so much and he [Sadler] could retain so much." Ostensibly, the arrangement between Baughn *30 and Sadler was for the purpose of conducting an extensive public relations campaign to generate business for Alabama Marking & Sign Company from counties and districts under the striping contract. In fact, Sadler's sole function was to conceal, or cover up, Baughn's particpation in the operation. At no time did Baughn actually intend to conduct such a public relations campaign. Baughn knew such a campaign was unnecessary because Craig had assured him on a number of occasions that he would see to it that there would be sufficient mileage requisitioned under the contract. For the years 1960, 1961, and 1962 Sadler received checks drawn on the company payable to Howard Sadler and Associates in the respective amounts of $53,222, $46,664 and $14,328. On the partnership returns filed in the company's name for the year 1960, 1961, and 1962 Howard Sadler and Associates was listed as a partner whose distributive share of the company's income for these years was $53,222, $46,664 and $14,328, respectively. Howard Sadler and Associates was not a partner of the company for the years in question. Howard Sadler performed no services for, nor contributed any capital to, the company. He contributed *31 no capital to Howard Sadler and Associates nor did he perform any services for Howard Sadler and Associates other than receiving and cashing checks and turning most of the proceeds over to Baughn. On their joint Federal income tax returns for the years 1960, 1961, and 1962 Baughn and his wife reported $38,375, $31,595.20, and $8,872, respectively, as "wages, salaries, etc.," from Howard Sadler and Associates. Of the amounts received from Alabama Marking & Sign Company, Baughn permitted Sadler to keep $14,847 in 1960, $15,068.80 in 1961, and $5,456 in 1962. During most of the year 1960, Baughn had an arrangement with Stephen Farmer Seale, Vice-president and Director of Advertising for South Magazine, whereby the checks for Craig's share of the proceeds were made out to Mollie Lavada Taylor, Seale's recently widowed 73 year old sister. Mollie cashed the checks and returned the proceeds, except for a small portion which she was allowed to keep, to Seale, who gave them to Baughn. From April to December 1960, nine checks drawn on the company were issued to Mollie in the total amount of $39,650. In 1961 only one check for $3,160 was issued to her. Pursuant to the arrangement, Mollie *32 in 1960 received $1,700 and a small portion of the $3,160 in 1961; and in 1960 Seale received $2,000 for his services in converting the checks to cash. Seale received all the checks from Baughn in Baughn's office in Birmingham. Although Mollie was listed as a partner on the partnership returns filed in the company's name for the years 1960 and 1961, she was no more than a conduit to convert Craig's share of the profits into cash to conceal his involvement in the undertaking. Mollie was not a partner for Federal tax purposes of the company in either 1960 or 1961. Knowing that his sister was listed as a partner receiving distributive shares of income of $39,650 in 1960 and $3,160 in 1961, Seale retained $8,000 and $140 in 1960 and 1961 from the proceeds from the checks to pay Federal and State income taxes on the income Mollie had ostensibly received from the company as a partner. The balance of the $39,650, or roughly $27,950, was remitted to Baughn in 1960, as was most of the $3,160 in 1961. Baughn delivered the money received back from Seale to Craig to cover Craig's share of the profits. In April 1961, Seale discovered he had miscalculated the liability for Federal and State *33 taxes on the $39,650 of income ostensibly received by his sister Mollie. To pay the combined taxes on this amount of income, he needed an additional $6,500. Upon learning of Seale's predicament, Baughn told him that he had to see a certain person in Montgomery and he would see what he could do about raising the money for taxes. While the person Baughn referred to was Craig, he did not disclose this fact to Seale. A few days later, Baughn gave Seale $6,000 with the explanation that he was able to get $4,000 from the man in Montgomery and that he was putting up the 1452 other $2,000. At that time, Baughn cautioned Seale to make certain to pay taxes on the $2,000 which he had kept for himself. On the Federal income tax returns prepared by Seale and filed in Mollie's name in 1960 and 1961, the $39,650 and $3,160, respectively, were reported as Mollie's income. Both Federal and State income taxes were paid thereon. Usually, Baughn in his hotel room in Montgomery personally delivered to Craig his share of the profits less those amounts retained to pay income taxes with respect to the amounts ostensibly going to Mollie. Barton frequently was present on such occasions. Craig bitterly *34 complained to Baughn about the amounts withheld from his share of the profits. These complaints became so frequent and vehement that Baughn in September or October 1960 decided to discontinue the arrangement with Seale and Mollie and to have Barton take over the task of converting Craig's share of the proceeds into cash. Barton agreed. From late 1960 until the termination of the road striping venture in 1962, Barton, at different times, used various individuals whose only function was to cash checks and return the proceeds to him. However, during the entire time in question, Baughn continued to deliver the money personally to Craig. One of those individuals used by Barton was Jim Rushin, whom Barton had known for a long time. In early 1960 Rushin had borrowed $2,000 from Barton. Rushin's son, James T. Rushin (herein called J.T. Rushin), at that time was in the foreign car business and was in need of money. Rushin frequently saw Barton at the country club and on such occasions asked Barton to lend him money for his son's business. Barton offered to lend J. T. Rushin money if he agreed, and he did, to cash checks drawn on Alabama Marking & Sign Company and return the proceeds to Barton. *35 In 1960, three checks were drawn on the company payable to J.T. Rushin in the total amount of $23,000. After cashing these checks, Rushin remitted $11,500 in cash to Barton and a promissory note for the remaining $11,500 which he kept as a loan. In 1961, J.T. Rushin received only one check from the company in the amount of $5,614.57. Rushin kept all the proceeds from this check for the purpose of paying income taxes on the income ostensibly received by him as a partner from the company in 1960. Upon receiving the check in 1961 Rushin executed a single note payable to Barton in the amount of $14,000. All the prior notes were consolidated into this one. On the partnership return filed in the company's name for the years 1960 and 1961, J.T. Rushin was listed as a partner whose distributive share of the company's income was $23,000 in 1960 and $5,614.57 in 1961. J.T. Rushin was not a partner of the company in 1960 and 1961. In 1960 Barton issued two checks to Harold Baker drawn on the company in the total amount of $3,600. Baker retained $1,600 as a loan and returned $2,000 in cash to Barton. On the patnership return filed in the company's name for the yejr 1960, the company claimed *36 a business expense deduction of $3,600 as salary paid to Baker. Baker performed no services for the company. Also in 1960 Barton issued checks to Curtis Frizzel in the amount of $4,800 drawn on the company. Of this amount, Frizzed kept $4,200 which he reported on his Federal income tax return for that year as salary from the company. The remaining $600 he gave back to Barton in cash. On the partnership return filed in the company's name for the year 1960, the company claimed a deduction for $4,800 as salary paid to Frizzel. Frizzel performed no services for the company in 1960. On November 10, 1960, Barton issued a check drawn on the company in the amount of $1,100 to Vercie D. Butler, who at that time was Baughn's personal secretary. The $1,100 was compensation to Vercie D. Butler for typing work she had done in Baughn's office for the company. Baughn delivered the check to her. On the partnership return filed in the company's name in 1960, the $1,100 was deducted and allowed as a business expense. During the years 1961 and 1962, Barton issued checks to Frizzel drawn on the company in the respective amounts of $45,409 and $16,185. Of the $45,409, Frizzel kept $4,130 and returned *37 the balance of $41,279 to Barton. On his 1961 Federal income tax return, Frizzel reported the $4,130 as salary from the company. On the partnership returns filed in the company's name for the years 1961 and 1962, Frizzel was listed as a partner whose distributive share of the company's income for such years was $45,409 in 1961 and $16,185 in 1962. Frizzel was not a partner of the company for such years and did not receive the $45,409 and $16,185 1453 in 1961 and 1962, respectively, as distributive shares of the company's income. Barton used Frizzel in these years as the primary means of raising cash to cover Craig's share of the profits. For the year 1961, Barton had a similar arrangement with Arthur Hartley under which Hartley received small amounts of money for cashing checks and returning the proceeds to Barton. During the year Hartley received checks in the total amount of $10,400. On the partnership return filed in the company's name for the year 1961, Hartley was listed as a partner receiving a distributive share of income of $10,400. Hartley was not a partner of the company in 1961. Also in 1961, Barton gave Hartley $1,500, stating that he was going to let him have the *38 $1,500 and that he was going to set it up on his books as a deductible business item so that he could deduct it from his income taxes. Barton explained to Hartley that he would designate him as an inspector and that Hartley could work it out later. Barton, pursuant to Baughn's request, made payments of $5,011 in 1960, $2,800 in 1961, and $1,400 in 1962 to Merriel S. Campbell, a long time family friend of Baughn. On the partnership returns filed in the company's name for such years, these amounts were deducted as salary paid to Merriel S. Campbell. She performed no services for the company during such years. In 1961 Carolyn Hazlett received $250 from the company. On the partnership return filed for that year, this amount was claimed as a business expense deduction as salary paid to Carolyn Hazlett. She performed no services for the company during 1961. After receiving back cash from the various individuals - Rushin, Frizzel, Hartley, and Baker - Barton contacted Baughn and together they would then meet with Craig on a monthly basis to give him his share of the profits. The sole purpose for fictitiously listing M. L. Taylor, J. T. Rushin, C. T. Frizzel, and A. C. Hartley as partners *39 on the partnership returns was to convert funds from the company bank account to cash to cover Craig's share of the profits. Because these persons were listed as partners receiving income from the company, Barton withheld a certain amount of money from Craig's share to pay taxes on the money which the fictitious partners had apparently received, as had been done with respect to the amounts received by Mollie Taylor. The following schedule shows those persons listed as partners and their respective shares of the company's distributable income for the years 1960, 1961, and 1962 by the partnership returns, Form 1065, which Barton had filed in the name of the company: Name
Amount
1960:
Howard Sadler & Associates
$ 53,222.00
M. L. Taylor
39,650.00
J. T. Rushing[sic]
23,000.00
Joe T. Barton 49,112.50
Total
$164,984.50
1961:
Howard Sadler & Associates
$ 46,664.00
M. L. Taylor
3,160.00
C. E. Frizzel
45,409.00
A. C. Hartley, Jr.
10,400.00
J. T. Rushing[sic]
5,614.57
Joe T. Barton 56,302.70
Total
$167,550.27
1962:
Howard Sadler & Associates
$ 14,328.00
Curtis Frizzel
16,185.00
Joe T. Bartin[sic] 42,113.31
Total
$ 72,626.31
*40 The total number of highway miles striped under the contract awarded to the company for the years 1960, 1961, and 1962 and the amounts received therefor in each of those years from the State of Alabama were as follows: Year
Number of miles
Amount received
1960
10,093.5390
$398,694.80
1961
9,214.4487
363,970.73
1962 3,091.1978
122,102.31
Total
22,399.1855
$884,767.84
Respondent's agent in each of the years in issue recomputed the company's income. For the year 1960 he increased the company's income by $20,164.91 resulting from the disallowance of the following deductions claimed on the partnership return filed for that year: traveling expenses of $5,114, telephone expenses of $90.77, advertising and sales promotion of $1,549.14, and salary expenses of $13,411. Respondent determined that the company's income for 1960 was $185,150.20 rather than $164,984.50 as reported on the partnership return. For the year 1961 respondent increased the company's income by $8,221.35 resulting from the inclusion of $1,098.10 under the constructive receipts doctrine and the disallowance of the following claimed deductions on the partnership return filed in that *41 year: dues and subscriptions of $433.58, travel expenses of $3,196.46, telephone expenses of $152.26, inspection fees of $3,050, subcontract expense of $190.95, and advertising expenses of $100. Respondent 1454 determined that the company's income for 1961 was $175,771.62 instead of $167,550.27 as reported on the partnership return. For 1962 respondent determined that the company's income was $58,122.22 and not $72,626.31 as reported on the partnership return. After making all of these adjustments, respondent determined that the entire net income derived from the road striping venture in each of the years involved is taxable solely to Baughn and Barton. The following schedule shows the income received from Alabama Marking & Sign Company as reported by Barton and his wife on their joint Federal income tax returns for the years in issue and Barton's share of such income as determined by respondent in his notice of deficiency: Year
Reported incomefrom company
Increase (ordecrease)determined byrespondent
Total incomedetermined byrespondent
1960
$49,112.50
$46, 654.59
$95,767.09
1961
56,302.70
34,613.42
90,916.12
1962
42,113.31
(12,050.31)
30,063.00
*42 The following schedule shows the income received through Howard Sadler and Associates from the company as reported by Baughn and his wife on their joint Federal income tax returns for the years in issue and Baughn's share of such income as determined by respondent in his notice of deficiency: Year
As reported
Increased pernotice ofdeficiency
Total in- comeper notice ofdeficiency
1960
$38,375.00
$51,008.11
$ 89,383.11
1961
31,595.20
53,260.50
84,855.70
1962
8,872.00
19,187.10
28,059.10
On their 1961 joint Federal income tax return, filed on April 15, 1962, Baughn and his wife reported gross income of $50,020.20, consisting of the following items: Salary - Alabama News Magazine
$18,400.00
Howard Sadler and Associates
31,595.20
Interest on Savings & Loan Account 25.00
Total gross income
$50,020.20
The statutory notice of deficiency sent to Baughn was mailed on January 9, 1968. Baughn and his wife omitted gross income of $31,671.78 required to be shown on their return for 1961. Ultimate Findings 1. The arrangement among Baughn, Barton, and Craig constituted a partnership for Federal tax purposes. 2. Hubert F. Baughn *43 is liable for tax only on 36 percent of the net income from the road striping contract. 3. Joe T. Barton is liable for tax only on 38 percent of the income from the road striping contract. 4. For each of the years 1960 and 1961 a part of the underpayment of tax by the Bartons was due to fraud with intent to evade tax, and each of their Federal income tax returns for those years was a false and fraudulent return with intent to evade tax. 5. Respondent has failed to prove by clear and convincing evidence that a part of the underpayment of tax by the Baughns in any of the years 1960, 1961 and 1962 was due to fraud with intent to evade tax. 6. Assessment of the deficiency against the Baughns for the year 1961 is not barred by the statute of limitations. Opinion In his notice of deficiency in docket No. 2049-68, respondent made a number of adjustments in the taxable income of the Bartons for each of the years in issue. The evidence, however, relates only to Barton's liability for tax on the income derived from the road striping contract. Respondent's determinations are presumptively *44 correct and the burden of proving them to be wrong falls upon the petitioners. Welch v. Helvering, 290 U.S. 111 (1933). They have failed to offer any evidence to negate the presumptive correctness of respondent's determinations relating to such other items. Therefore, we sustain the respondent's adjustments. The principal problem presented herein is the determination of the proper taxpayer or taxpayers with respect to the income derived from the road striping contract. Specifically, did Baughn or Barton, or both, receive income therefrom in excess of that reported on their respective returns for each of the years in question? Respondent, after making certain adjustments to the company's income, [2] proposes 1455 to tax the entire net income derived from the road striping venture for each of the years 1960, 1961 and 1962 solely to Barton and Baughn on the theory that the arrangement between them constituted a partnership under sections 761(a) and 7701(a) (2), and the regulations promulgated thereunder, and that the amounts paid to Craig were no more than bribes or kickbacks and, as such, are nondeductible expenses because they were illegal and contrary to sharply *45 defined public policy. In the alternative, respondent argues that, if no partnership existed between Barton and Baughn, there was an agreement between them under which Barton was to pay Baughn $12 per mile of the proceeds received from the road striping contract. From this he concludes that Barton is taxable on the entire net income from the venture (approximately $19.50 per mile) and that the $12 per mile payments to Baughn are not ordinary and necessary business expenses and are not deductible because they are made in contravention of a well-defined public policy. He further concludes that Baughn is taxable on the entire $12 per mile payments without any deductions for the $5 per mile payments admittedly made to Craig because they were made in contravention of a well-defined public policy. Baughn vigorously contends that he did not understate his income in any *46 of the years in issue but that he reported all income received from the proceeds of the road striping contract and paid taxes thereon. In support of his contention, Baughn argues that no partnership for Federal tax purposes existed between himself and Barton, asserting that the money he received from the Alabama Marking & Sign Company was compensation for his assistance to Barton in getting the contract and for public relations work. Alternatively, Baughn argues that, if there was a partnership, the partners were Barton, Craig, and Howard Sadler and Associates, and that he reported all income received through Howard Sadler and Associates and paid taxes thereon. Section 761(a) defines a partnership as including "a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, which is not * * * a corporation or trust or estate." [3] Plainly, the statutory definition of partnership is considerably broader in scope than the common law meaning of the term. *47 Section 1,761-1 (a)(1), Income Tax Regs.; see also section 301.7701-1(c), Procedure and Administration Regs. The Internal Revenue Code prescribes its own standards, "undisturbed by variations in the laws of the States pertaining to partnerships," for qualification of an unincorporated organization as a partnership and therefore supersedes local law. Willis, Handbook of Partnership Taxation, p. 3 (1957). See also Delores Crabb, 41 B.T.A. 686, 696 (1940). Whether the arrangement among Baughn, Barton, and Craig constituted a partnership under sections 761(a) and 7701(a) (2), and the regulations promulgated thereunder, is a question of fact to be determined from all the existing circumstances. Hubert M. Luna, 42 T.C. 1067, 1077-1078 (1964); Beck Chemical Equipment Corporation, 27 T.C. 840 (1957); Wm. J. Lemp Brewing Co., 18 T.C. 586 (1952). Thus, the crucial question is "whether the parties intended to, and did in fact, *48 join together for the present conduct of an undertaking or enterprise." Hubert M. Luna, supra at 1077. In the Luna case we indicated that the following factors were relevant, though not necessarily conclusive, in determining whether a joint venture exists for tax purposes: The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt, that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities *49 for the enterprise. These factors are equally relevant to the determination of all types of partnerships 1456 for tax purposes. The leading case of Commissioner v. Culbertson, 337 U.S. 733 (1949), [4] removed all doubt that these objective standards must yield to the ascertainment of the true intention of the parties to enter into a partnership relationship. In the Culbertson case the Supreme Court said: The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard * * *, but whether considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. Hence we must rely upon these legal principles in determining the legal status of Baughn and Barton with respect *50 to the road striping. In these circumstances we cannot completely agree with the positions of either party. The proper solution, we think, lies somewhere between the two. After a careful examination of the entire record, we conclude there was a partnership with respect to the road striping contract, but that the partners thereof were Baughn, Barton and Craig. Baughn contends that "(if) the parties involved had intended to establish a partnership, we can but assume that they would have complied with controlling State law." This contention is completely without merit. To be sure, the compliance or noncompliance with local law pertaining to partnerships may be some evidence of the parties' intention, but we attach no significance to the parties' noncompliance with Alabama law under the peculiar *51 facts of this case. Nor do we think it is significant that Barton, in establishing a checking account for the company, did not establish a partnership account. It is well settled that "neither local law nor the expressed intent of the parties as to the legal nature and effect of their * * * agreements are conclusive as to the existence or nonexistence of a partnership or joint venture for Federal tax purposes." Haley v. Commissioner, 203 F. 2d 815, 818 (C.A. 5, 1953); Solomon v. Commissioner, 89 F. 2d 569 (C.A. 5, 1937), affirming 34 B.T.A. 723 (1936). Both respondent and Baughn have placed undue reliance on the law of Alabama. There may be a partnership for Federal income tax purposes, although there is no partnership as a matter of State law. See E. G. Wadel, 44 B.T.A. 1042 (1941); Dolores Crabb, supra.
While the parties herein never held themselves out to the public as joint venturers or partners, that alone is not conclusive. *52 Individuals may constitute a partnership for tax purposes even though they expressly disclaim any intention to enter into a partnership relation. Haley v. Commissioner, supra; Estate of L. O. Koen, 14 T.C. 1406 (1950); cf. Solomon v. Commissioner, supra, where the Court held that statements pertaining to the status of a particular organization made by the parties in the agreement are not conclusive. We think respondent views the facts of this case with "tunnel vision." He points to Baughn's "intermeddling" in the affairs of the company, his contribution of services and skills, his sharing of profits, and his control over the entire operation as proof that the relationship between Baughn and Barton constituted a partnership for tax purposes. But these same determining factors, when viewed in proper perspective, clearly show that Craig was just as much a partner with respect to the road striping venture as Baughn or Barton. To draw a distinction between the legal status of Baughn and Craig with respect to the road striping venture would be logically *53 inconsistent. And such a distinction would depend upon "elusive and subtle casuistries which * * * possess no relevance for tax purposes." Helvering v. Hallock, 309 U.S. 106, 118 (1940). It is true that the facts herein differ somewhat from the ordinary situation in which two or more parties agree initially to undertake a joint enterprise. But several factors, we think, support the conclusion 1457 that the arrangement among Baughn, Barton and Craig constituted a partnership for Federal tax purposes. 1. Agreement to Mulct the State of Alabama and Share Profits Therefrom. The evidence definitely establishes an agreement in fact, if not in form, among Baughn, Barton and Craig to jointly mulct or defraud the State of Alabama by fraudulently eliciting excessive amounts of money under the guise of the road striping contract and to share the profits therefrom. Estate of L. O. Koen, supra; see Stoffield v. Commissioner, 203 F. 2d 667 (C.A. 7, 1963), and Weizer v. Commissioner, 165 F. 2d 772 (C.A. 6, 1947), where partnerships were held to exist without any formal agreement. *54 The agreement to operate as a partnership need not be formal; it may be casual and merely oral. Albert T. Felix, 12 T.C. 933 (1949). We have no doubt that the agreement was among Baughn, Barton and Craig. It cannot be denied that Baughn and Barton knew that Craig intended to share whatever profits were made, "or there wouldn't be any work ordered under the contract." Baughn's admonition to Barton that they had to reach some agreement with Craig, coupled with their resulting activities pertaining to the road striping contract, convinces us that all three of them did in fact enter into an agreement. Although the three never considered themselves to be partners, that too is not conclusive. Individuals may constitute a partnership for Federal tax purposes even though they never thought of themselves as partners nor held themselves out as such to the public. Haley v. Commissioner, supra.Nor is it significant that the agreement among Baughn, Barton and Craig lacked most of the formalization that such an agreement would have between parties who were not engaged in such *55 a shady undertaking, especially where the evidence, as here, shows that they agreed to share the undertaking and actually carried out their oral agreement. Morris W. Zack, 25 T.C. 676 (1955), affd. 245 F. 2d 235 (C.A. 6, 1957). 2. Joint Contribution of Services. Baughn, Barton and Craig each contributed essential services to the venture. This is another indication that their relationship constituted a partnership. Jahn v. Pedrick, 229 F. 2d 71 (C.A. 2, 1956); W. H. Simmons, 22 B.T.A. 1106 (1931); and United States v. Frazell, 335 F. 2d 487 (C.A. 5, 1964). Respondent points to the contribution of services by Baughn and Barton to the venture as proof that they were a partnership, yet he ignores Craig's participation therein. All three individuals were essential to the venture. Craig was certainly the indispensable cog in the fraudulent scheme to mulct the State of Alabama. The entire operation evolved around him. He was principally responsible for Barton getting the contract. He was responsible for ordering the mileage under the contract and thus responsible for determining how much money was to be made from the *56 venture. Although Baughn did not contribute any capital to the venture, he contributed vital services and his political influence. And, of course, the rendering of services has been recognized as sufficient to establish a partnership. W. H. Simmons, supra.Moreover, there has been no showing that capital was a material factor in the production of income. The fact that the actual work was subcontracted to Williams gives rise to the inference that capital was not a material factor. Barton, as the front man, gave the venture the appearance of legitimacy. 3. Mutual Control of the Enterprise. The record clearly shows that Baughn, Barton and Craig each had a voice in the control of the enterprise. This further indicates that the relationship among all three of them constituted a partnership. J. Roland Brady, 25 T.C. 682 (1955). We reject, as contrary to fact, Baughn's allegation that he had no control over the venture. Baughn admitted that Craig made it evident from the outset that Barton did not mean anything to the administration in power and that, if he wanted to get any work under the contract, he would have "to play ball" with Baughn. We infer from this *57 that Craig effectively vested a great deal of control over the entire operation in Baughn. Additional proof of Baughn's control over the enterprise can be discerned from his assurance to Craig that he "could handle" Joe Barton and he would make sure that Craig got a part of the profits. To be sure, one cannot "handle" another individual unless he has control over him. While respondent points to Baughn's control over the enterprise as proof that Baughn was a partner, he again ignores the fact that Craig, too, possessed and exercised a strong measure of control over the entire operation. Plainly, as can be seen from respondent's brief, "Craig, on his part, 1458 intentionally wrote the contract so that he could have a measure of control over the whole operation." Surely if Baughn's control over the operation is proof that he was a partner, then Craig's control must likewise be proof of his partnership status. 4. A Sharing of Profits and Losses. Craig, as well as Baughn and Barton, shared the profits from the enterprise. Respondent avers that "the standard test" in determining whether a partnership exists is whether profits are shared. The untenable nature of respondent's argument *58 that Baughn and Barton were the only partners involved in the venture is discernible from the difficulty he has in determining the proper profit sharing ratio. Section 704(a) provides that a partner's proportionate share of partnership income is generally determined by the partnership agreement. See also section 1.704-1(a), Income Tax Regs.
At trial respondent's agent testified that 7/14.5 of the net income from the road striping contract was allocated to Baughn and 7.5/14.5 thereof to Barton. This particular allocation apparently served as the basis for respondent's determinations in his notices of deficiencies. The record is unmistakably clear that no agreement providing for such an allocation existed between Baughn and Barton. Respondent must have recognized this flaw in his determination because on brief he states: Barton also admits to the agreement that Hubert would get $12 a mile as his share of the profits of the venture (of which $5 was paid to Craig as a bribe) and Barton would retain $7.50 a mile. This, of course, was the profit sharing ratio. *59 From this we assume that respondent now takes the position that 12/19.5 of the net proceeds from the road striping venture are attributable to Baughn and 7.5/19.5 thereof are likewise attributable to Barton. There is a slight discrepancy in the stipulated statements of Baughn and Barton as to the determination of Baughn's share of the proceeds. According to Baughn, Barton said: "Well, Hubert I can pay you about $10 a mile, and maybe I might even be able to go as much as $12 a mile." (Emphasis added.) Barton, according to his statement, said: "Well, Hubert I can go $12 a mile for you and Craig both." (Emphasis added.) These statements, however, in no way constituted an agreement between Baughn and Barton to the effect that Baughn was to receive $12 per mile. We are not inclined to place any particular significance, as respondent does, on the fact that Barton may have said to Baughn, "I can pay you." It is quite apparent from all the circumstances herein that Barton's use of this language was not intended to indicate that he was in a position to determine by himself how much Baughn and Craig were going to get from the venture. Common sense tells us that Baughn and Craig by virtue of *60 their control over the operation must have had some voice in the allocation of the profits. While certain language in the stipulated statements of Baughn and Barton may be construed to support respondent's allocation, it is our conclusion that in light of all the facts and circumstances of this case there was no agreement that Baughn was to receive $12 per mile. As we construe the agreement, the profits of $19.50 per mile were to be divided among the three as follows: $7.50 per mile to Barton, $7 per mile to Baughn and $5 per mile to Craig. We note that respondent does not deny that the profits, in fact, were shared according to this formula. Baughn contends that he was not a partner or joint venturer because there was no agreement for the sharing of losses. Cf. Roland P. Place, 17 T.C. 199 (1951), affd. 199 F. 2d 373 (C.A. 6, 1952). This contention, under the circumstances herein, is without merit. The parties were well aware that the venture was not going to sustain any losses. Their collusive arrangement in obtaining the contract assured them that the venture would not suffer any losses. Moreover, at the time the allocation of profits was agreed upon, *61 the contract had already been awarded at a price of $39.50 per mile and the actual work thereunder was subcontracted out at the price of $20 per mile, leaving $19.50 per mile for the parties to share among themselves. "As in any matter on which the partnership agreement * * * is silent, the provisions of local law shall be considered to constitute a part of the agreement." Section 1.761-1(c), Income Tax Regs. Under Alabama law, "[an] agreement to divide the profits of a business implies an agreement for a corresponding division of its losses, unless it is otherwise expressly stipulated." Alabama Code, Title 43, Section 30 (1958). Even though the agreement of the parties may not have provided for the division of losses, their agreement to share the profits 1459 implies an agreement to divide the losses in the same proportions. On this record we sustain Baughn's alternative argument that Craig - not Baughn or Barton - is chargeable with liability for the tax on the income representing his $5 per mile share on the ground that Craig was a partner, and such *62 income represented his distributive share of the partnership profits. While acknowledging that Craig actually received $5 per mile for each mile striped under the contract, respondent disregards the agreement among Barton, Baughn and Craig to divide the profits in specified proportions, [5] and merely assumes, without discussion, that such amounts are initially taxable to Barton and Baughn, as partners, and are nondeductible expenses because they are contrary to public policy. We realize that Craig's participation in the venture was a betrayal of public trust and therefore contrary to established public policy. This does not mean, however, that public policy requires treating income which clearly belongs to Craig as belonging to Baughn and Barton. Craig through his "measure of control over *63 the whole operation" effectively exercised dominion and control over the income he received from the road striping venture. See Corliss v. Bowers 281 U.S. 376 (1930); Griffiths v. Helvering, 308 U.S. 355 (1939). Respondent's public policy argument rests upon the legal and factual misconception that Craig was not a partner for Federal tax purposes. Respondent made no effort to reply to Baughn's argument that Craig was a partner and that, as such, he was taxable in the first instance on his proportionate share of the venture's income. He has cited no authority, nor have we found any, to support the proposition that a public official, as a matter of law, cannot be considered a partner where his participation in the enterprise constitues a betrayal of public trust and is contrary to established public policy. Cf. Charles Clark, 19 T.C. 48, 52 (1952). Viewing the arrangement here involved and Craig's conduct in the light of the broad statutory definition of a partnership, as contained in the Internal Revenue Code, we conclude that a partnership did in fact exist and that Craig was a partner thereof. Consequently, Craig's distributive share *64 of the profits from the road striping venture in each of the years in question is not taxable to either Baughn or Barton. Respondent's reliance on the public policy argument is entirely misplaced under the circumstances of this case, and the cases cited are all factually distinguishable. Cf. Standard Oil Company v. Commissioner, 129 F. 2d 363 (C.A. 7, 1942); United States v. Sullivan, 274 U.S. 259 (1927); Commissioner v. Heininger,, 320 U,S. 467 (1943); Harden Mortgage Loan Co. v. Commissioner, 137 F. 2d 282, Rugel v. Commissioner, 127 F. 2d 393 (C.A. 8, 1942); Frank A. Maddas, 40 B.T.A. 572 (1939), affd. 114 F. 2d 548 (C.A. 3, 1940). In short, we conclude that the proper taxpayer in the first instance with respect to the $5 per mile payments was Craig. Cf. Horace Mill, 5 T.C. 691 (1945); Hamlin's Estate v. Commissioner, 188 F. 2d 364 (C.A. 6, 1951), affirming a Memorandum Opinion of this Court. We hold that Baughn and Barton are taxable only on their respective proportionate shares of such income as determined by their agreement. The practical effect of our conclusion *65 is that Baughn is taxable only on that portion of the company's income which $7 bears to $19.50 (or roughly 36 percent) and Barton is taxable only on that portion of such income which $7.50 bears to $19.50 (or roughly 38 percent). Baughn also contends that he did not understate his income in any of the years in issue because he reported all the income which he actually received through Howard Sadler and Associates and paid taxes thereon. To support this allegation, he argues in the alternative: (1) That the Association was a partnership as defined by section 7701(a) (2) and that [Baughn's] distributive share was 60 percent; (2) That if no partnership existed the 40 percent retained by Sadler was an ordinary and necessary business expense under section 162 of the Internal Revenue Code and hence deductible by; or (3) That the 40 percent retained by 1460 Sadler was his income and not that of. The argument that the association constituted a partnership and that Baughn's distributive share of the income therefrom was 60 percent is simply not supported by the record. As we have already indicated in our findings of fact, the sole reason for the creation *66 of the "association" between Sadler and Baughn was "for the purpose of keeping [Baughn] in the background." It is clear that Sadler, in fact, performed no services for either Howard Sadler and Associates (other than cashing checks) or the company. It is likewise clear that Baughn never contemplated that Sadler would perform any services. Baughn's explanation that the association was formed for the purpose of publicizing highway striping by private contractor is contrary to fact. Baughn knew that Craig's participation in the venture made such a publicity campaign completely unnecessary. Our conclusion in this respect is buttressed by the following excerpt from the transcript of Baughn's testimony at the trial herein: Q. Isn't this true, that none of this was necessary since Mr. Craig was giving you all the miles he could possibly get? A. Mr. Craig, yes, Mr. Craig took charge of the whole business. He issued the orders and he just wanted to paint, paint, paint all the time, wasn't any question about that. * * * Q. Did Howard Sadler have any connection with the Alabama Marking & Sign Company to your knowledge? A. No sir, he did not. The only connection was, and I arranged this *67 with Mr. Sadler and then got Mr. Barton to send Mr. Sadler a check once a month. I think he had nothing further remotely or otherwise to do with the Alabama Marking & Sign Company. We infer from this testimony that Baughn and Sadler never intended to, and did not in fact, join together for the conduct of an undertaking or enterprise. Hubert M. Luna, supra. Thus the association was not a partnership for Federal tax purposes. Baughn next argues that "the 40 percent retained by Sadler was paid to Sadler by [Baughn] for Sadler's services in keeping [Baughn's] participation from the public eye and for public relations services on behalf of Joe T. Barton." We have already rejected as without any factual substance the argument that the payments to Sadler were for "public relations services on behalf of Joe T. Barton." Moreover, as reflected in our findings of fact, Sadler received substantially less than 40 percent of the proceeds paid to Howard Sadler and Associates during each of the years involved. We consider this argument without merit for three reasons. First, there is no evidence that the payments were paid or incurred by Baughn "in carrying on a trade or business" *68 as required by section 162. Second, there is no evidence showing how such payments were "ordinary and necessary" business expenses. See Deputy v. duPont, 308 U.S. 488 (1940), wherein the Supreme Court defined the term ordinary to mean "normal, usual, or customary." Baughn has made no showing that it was "normal, usual, or customary" to make payments to keep from the public eye participation in a "shady" joint enterprise. Third, there is no showing that such payments were "reasonable" within the purview of section 162 (a) (1). Relying on Corliss v. Bowers, supra, and Griffiths v. Helvering, supra, Baughn claims that Sadler is taxable on the amounts he received, and not Baughn, because income is taxable to the individual who is able to direct and control it. The evidence is insufficient herein to support the claim that Sadler was able to direct and control any of the money he received from the company except to the extent Baughn allowed him to do so. Instead, the evidence, in particular Baughn's statement, clearly shows that Baughn directed and controlled *69 all the income representing his $7 per mile share of the proceeds from the road striping contract. With regard to his dealings with Sadler, Baughn stated: As a practical matter when we would receive such check, I would sit down with Mr. Sadler, and I would explain to him certain expenses that had been incurred from time to time, and point out to him that he had to bear a part of these expenses and I would tell him to write me a check for so much and he could retain so much. This indicates to us that Baughn - not Sadler - exercised complete dominion and control over all the moneys channeled through Howard Sadler and Associates from the company. Accordingly, we hold that Baughn is fully taxable on his share of the proceeds from the road striping venture, i.e., 36 1461 percent, and is not entitled to exclude or deduct from his gross income those amounts going to Sadler. There was definitely underpayment of tax by both Baughn and Barton in each of the years before us. The question remains, however, whether any part of the underpayments of tax by Baughn and Barton in any of the years was due to fraud with intent to evade tax under section 6653(b). On this issue *70 respondent has the burden of proving fraud by clear and convincing evidence. Section 7454(a); Arlette Coat Co., 14 T.C. 751 (1950). Respondent relies upon three factors to sustain his burden of proof as to fraud. 1. Fictitious Partners. Respondent points to the fact that the partnership returns were filed with fictitious partners and concludes that this is an indicia of fraudulent intent. As we have already indicated in the findings of fact, the sole purpose for fictitiously listing M. L. Taylor, J. T. Rushin, C. T. Frizzell, and A. G. Hartley as partners on the partnership returns was to convert funds from the partnership bank account to cash to cover Craig's share of the profits in such a manner as to conceal his participation in the venture. But we doubt whether this device of listing fictitious partners was used to evade the income taxes. We think respondent's reliance on the following cases is misplaced under these circumstances: Spies v. United States, 317 U.S. 492, 499 (1943); National City Bank of New York, 35 B.T.A. 975, 995 (1937), affd. 98 F. 2d 93 (C.A. 2, 1938); *71 Stoltzfus v. United States, 264 F. Supp. 824 (E.D. Pa. 1967), affd. 398 F. 2d 1002 (C.A. 3, 1968); George Herberger v. Commissioner, 195 F. 2d 293 (C.A. 9, 1952), affirming a Memorandum Opinion of this Court. In our judgment Baughn's use of Howard Sadler and Associates as a conduit, so that his participation in the undertaking could be kept secret, is not sufficient proof of a fraudulent intent to evade Federal taxes. Baughn's failure to report the amounts paid Howard Sadler and Associates is not indicative of fraud because the evidence shows that he entertained an honest, though incorrect, belief that such amounts were not reportable as his income. 2. Substantial Understatements of Income. Respondent stresses that the failure of Barton and Baughn to report substantial amounts of income over three years, absent a reasonable explanation, constitutes strong evidence of fraud, citing M. Rea Gano, 19 B.T.A. 518 (1930); Louis Halle, 7 T.C. 245 (1946), affd. 175 F. 2d 500 (C.A. 2, 1949); J. K. Vise, 31 T.C. 220 (1958), affd. 278 F. 2d 642 (C.A. 6, 1960); Charles A. Rogers, 38 B.T.A. 16 (1938), *72 affd. 111 F. 2d 987 (C.A. 6, 1940). It is true that consistent failure to report "substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent." Schwarzkopf v. Commissioner, 246 F. 2d 731, 734 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court; Kurnick v. Commissioner, 232 F. 2d 678 (C.A. 6, 1956), affirming a Memorandum Opinion of this Court; and Merritt v. Commissioner, 301 F. 2d 484 (C.A. 5, 1962). But respondent's argument on this point appears to be based on the faulty assumption that Baughn and Barton are taxable on all the income derived from the road striping venture and their failure to report all of such income on their respective income tax returns results in the "substantial understatement" to which respondent alludes. Clearly, this argument is inapplicable to the facts herein in view of our determination that Baughn and Barton are not the only persons taxable on the income from the road striping venture. 3. Fraudulent Taking of Improper Deductions on the Partnership *73 Returns. Respondent urges that both Barton and Baughn committed fraud with intent to evade tax by deliberately claiming false and fraudulent deductions on the partnership returns filed for each of the years in question resulting in the understatement of their taxable income on their respective individual income tax returns. It is well established that fraudulent intent can be inferred from the taxpayer's actions in falsifying his books resulting in the deliberate taking of improper deductions on his individual Federal income tax return. It is clear that Merriel S. Campbell received $5,011 in 1960, $2,800 in 1961, and $1,400 in 1962 from the company; that she performed no services therefor; and that Barton deducted such amounts from the company's income as reported on the partnership returns filed for such years as business expenses consisting of inspection fees. It is also clear that Harold Baker and Curtis Frizzell received $3,600 and $4,800, respectively, in 1960; that Carolyn Hazlett received 1462 $250 in 1961; that neither one of these individuals performed any services for the *74 company; and that Barton improperly claimed these amounts as deductible business expenses on the partnership returns filed for such years. The actions of Barton in setting up the amounts paid to the above individuals as deductible business expenses when he knew that they performed no services for the company is indeed strong proof of his conscious concealment of income. As to Barton, we think the facts are persuasive that for the years 1960 and 1961 he failed to report taxable income and that such failure was due to fraud with intent to evade tax. There can be no doubt that Barton knowingly falsified the books to conceal income as evidenced from the following statement which he admits making to Arthur Hartley: "I told him that though I would let him have this $1,500 that I was going to set it up on my books as a deductible item to my business so that I could deduct it from my income tax, and that I would designate him as an inspector, and he could work it out later." It is well settled that if any part of the underpayment of tax for any year is due to fraud, the addition to tax attaches *75 to the entire amount found to be due for that year. Section 6653(b); Arlette Coat Co., supra. Accordingly, we conclude that respondent has proved fraud by clear and convincing evidence with respect to Barton for the years 1960 and 1961. Cf. Webb v. Commissioner, 394 F. 2d 366 (C.A. 1968). Barton is therefore liable for the additions to tax under section 6653(b) for such years. As to Baughn, we believe that respondent has failed to prove by clear and convincing evidence that part of the underpayments of tax for each of the years 1960, 1961 and 1962 was due to fraud with intent to evade tax. We are convinced on this record that Baughn reasonably believed that he was required to report only those amounts which he actually received and that he was not liable for tax on those amounts paid to Sadler and Craig. Moreover, we have no doubt that Baughn, although a partner for Federal tax purposes, never considered himself a partner and never thought he was liable for tax on income from the venture in excess of that he actually received. Our finding that Baughn was a partner for Federal tax purposes does not require a finding of fraud as to him. To sustain the addition *76 to tax against a partner filing his individual income tax return on the basis of false and fraudulent partnership books and records, the respondent must at least show that such partner had knowledge that income was being understated as a result thereof or reasonably should have had such knowledge. Cf. Estate of Howard T. Roe, 36 T.C. 939, 948 (1961); Stoumen v. Commissioner, 208 F. 2d 903 (C.A. 1954), affirming a Memorandum Opinion of this Court. We do have our suspicions that Baughn may have been aware that Barton falsified the books and deliberately claimed false deductions on the partnership returns. But respondent has not provided the necessary evidence for us to make such a finding. He has not demonstrated by clear and convincing evidence that Baughn had any knowledge that the improper deductions were being claimed or that Baughn was in any way a party to such practice. In short, we regard respondent's proof in this respect as woefully inadequate. Baughn reported all the income shown to be distributable to Howard Sadler and Associates except for those amounts actually paid to Sadler. It is significant, we think, that Baughn made no attempt to conceal *77 the fact that the income was derived through Howard Sadler and Associates. There is some evidence, although tenuous, that Sadler prepared and filed a partnership return for Howard Sadler and Associates. Respondent does not deny that Baughn reported all the income he actually received. We think this tends to negate a deliberate purpose to evade Federal taxes. Therefore, it is our conclusion that respondent has failed to produce evidence which clearly and convincingly proves fraud on the part of Baughn. The assessment of deficiencies against the Bartons is not barred by the statute of limitations. This is an affirmative defense which must be specifically pleaded by the petitioners if they expect to rely upon it as a bar to assessment. United Business Corporation of America, 19 B.T.A. 809, 831 (1930). Here the Bartons have failed to plead the statute of limitations. Moreover, since we have found fraud as to the Bartons, an assessment can be made at any time. Section 6501(c) (1). With respect to the Baughns, the statute of limitations on assessment has not been pleaded or placed in issue for the taxable years 1960 and 1962. However, they have pleaded and contended that *78 the assessment of any deficiency for the year 1961 is barred by the statute of limitations. We disagree with the contention. As set forth in our findings of fact, the Baughns 1463 omitted in excess of 25 percent of the gross income reported on their joint income tax return for 1951. Thus the six-year statute of limitations of section 6501(1) (e) applies to that year. The notice of deficiency was mailed within the six-year period. Consequently, the assessment of a deficiency for that year is not barred. To reflect the conclusions reached herein, Decisions will be entered under Rule 50. Footnotes
1. All staturoty references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. Neither Baughn nor Barton contests respondent's adjustments of the company's income. In the absence of any evidence negativing the presumptive correctness of these adjustments, we sustain them. See Rule 32, Rules of Practice, Tax Court of the United States; Welch v. Helvering, 290 U.S. 111↩ (1933).
3. Section 7701(a) (2) contains essentially this same definition.↩
4. Culbertson was a family partnership case, but the general principles set out therein apply to all partnership situations. Smith's Estate v. Commissioner, 313 F. 2d 724, 728-729 (C.A. 8, 1963); Edward C. James, 16 T.C. 930, 939 (1951), affirmed per curiam 197 F. 2d 813 (C.A. 5, 1952); Isadore Louis Rosenberg, 15 T.C. 1, 8↩ (1950).
5. It is generally held that where parties have an agreement to divide profits in specified proportions, they are taxable only with respect to their proportionate shares. See Meyer Liberman, 3 B.T.A. 617 (1926); Pearsall v. United States, 52 F. 2d 1050↩ (Ct. Cl. 1931).